UNITED STATES, Appellee,

v.

Edmund M. HURLEY, Defendant,
Appellant.

UNITED STATES, Appellee,

v.

Charles R. BURNETT, Defendant,
Appellant.

Nos. 90–1690, 90–1693.

United States Court of Appeals,
First Circuit.

Heard Dec. 2, 1991.

Decided Feb. 14, 1992.

Rehearing Denied March 11, 1992.

Albert F. Cullen, Jr., Boston, Mass., for appellants.

Robert L. Ullmann, Deputy Associate U.S. Atty., with whom Wayne A. Budd, U.S. Atty., and F. Dennis Saylor, IV, Sp. Counsel to Asst. Atty. Gen., Boston, Mass., were on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

COFFIN, Senior Circuit Judge.

Appellants Hurley and Burnett were charged in a 15–count indictment with participating in a sophisticated scheme to launder more than $5 million in illicit drug proceeds through the use of offshore front

companies. The district court granted their motions for judgment of acquittal on most of the charges, leaving the jury to consider only two counts against Hurley and three against Burnett. The jury returned guilty verdicts solely on a charge of conspiracy to defraud the IRS in violation of 18 U.S.C. § 371. On appeal, each appellant challenges his conviction on sufficiency and due process grounds. We affirm.

## I. *Background*

We shall recount the intricate factual backdrop of this case relatively briefly at this point, leaving for later discussion those additional facts necessary for full disposition of defendants' claims. Consistent with our responsibility in reviewing convictions for sufficiency of the evidence, we consider the facts in the light most favorable to the government. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Maraj*, 947 F.2d 520, 522 (1st Cir.1991).

Hurley and Burnett are both lawyers who spent substantial periods of time working for Salvatore "Mike" Caruana, a highly successful drug smuggler who earned millions of dollars from the unlawful importation and distribution of marijuana and hashish between 1978 and 1981. Caruana became a fugitive in March 1984, and still has not been apprehended. In 1987, however, federal agents executed search warrants at five locations in Massachusetts and Connecticut where Caruana had stored documents and computer files detailing investment activities associated with his drug profits. The records show that several Panamanian and Bahamian companies were set up in 1979 and 1980 for Caruana's use. None of the public records reveal Caruana's ownership.[1]

The indictment alleged that, from at least early 1979 to 1987, first Hurley, and then Burnett, knowingly assisted Caruana in a money laundering scheme that allowed him to hide and profitably invest $5 million of his illegal earnings. Defendants and others accomplished this deception, according to the government, through the network of front companies set up in Panama and the Bahamas, which made loans and investments in unusual ways, such as through the transfer of large amounts of cash. On two separate occasions in which defendants were involved, for example, Caruana transferred $100,000 in currency from briefcases to borrowers. In other transactions, after Caruana fled, checks drawn on Panamanian accounts were made out in the names of third parties for actual use and deposit by Caruana. The cash transactions allowed Caruana to produce facially legitimate income from drug profits that were not originally reported, while the third-party checks enabled him to retrieve funds when necessary in a manner that concealed that he was the recipient of such income.

Hurley's legal work for Caruana began in the late 1970s, and extended at least through the fall of 1982. After that time, he remained connected to Caruana primarily as a recipient of investment earnings that he forwarded to the Bahamas. Burnett first worked with Caruana in 1982 and continued to perform services for him until 1986. During this time, Caruana became a fugitive from justice, and Burnett maintained secret communications with him by means of a computer and code name.

A grand jury indicted Hurley, Burnett and five co-defendants, including Caruana, in March 1989. All seven defendants were charged with conspiring to defraud the IRS in violation of 18 U.S.C. § 371. Defendants Hurley and Burnett also were charged with conspiracy to racketeer as well as the substantive crime of racketeering, 18 U.S.C. § 1962(c), (d), and twelve counts of foreign travel in aid of racketeering, 18 U.S.C. § 1952. Trial began a year later for appellants and two co-defendants. Following presentation of the government's case, the court granted defendants' motions for judgment of acquittal, except for the conspiracy to defraud and racketeering con-

---

**1.** All of the listed officers for the corporations were employees of a Bahamiam law firm, Nottage, Miller and Johnson. Attorney Rubie Not-

tage and her husband Kendall W. Nottage, a Bahamian Cabinet Minister, are indicted co-conspirators and are fugitives.

spiracy counts against both defendants, one Travel Act count against Burnett and two counts against a third defendant not a party to this appeal. The jury returned guilty verdicts only against Hurley and Burnett on the conspiracy to defraud charge.

On appeal, defendants make two arguments: first, they claim that the indictment was improperly vague because it broadly charged a conspiracy to defraud the IRS rather than alleging violations of specific IRS requirements and, second, they contend that the evidence was insufficient to prove a knowing agreement to deceive the IRS.

## II. *Defective Indictment*

■ Hurley and Burnett were convicted under 18 U.S.C. § 371, which prohibits two distinct types of conspiracies: conspiracies to commit a specific offense against the United States and conspiracies to defraud the United States, or one of its agencies, "in any manner or for any purpose." Count 1 of the indictment charged defendants under the second, broader clause, alleging that they conspired "to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the [IRS] in the ascertainment, computation, and collection of income taxes owed by Salvatore M. Caruana."

Relying primarily on *United States v. Minarik*, 875 F.2d 1186 (6th Cir.1989), defendants argue that Count I was defective in that it charged a generic conspiracy to defraud the United States rather than a conspiracy to commit a specific tax offense—an error that they claim invalidates their convictions. In *Minarik*, the Sixth Circuit affirmed a district court's grant of judgment notwithstanding the verdict for two defendants whom it concluded had been charged improperly under the defraud clause. Among other things, the appeals court was concerned that the broad "conspiracy to defraud" language of the indictment overstated the defendants' duty to disclose information to the IRS. *See id.* at 1195. The court thus held that, where the object of an alleged criminal agreement is

covered by a specific criminal statute that "closely defin[es]" a citizen's duties, the government must prosecute under the "offense," not the "defraud," clause of § 371. *See id.* at 1194–96.

Appellants claim that, like the defendants in *Minarik*, they had no general responsibility to assist the IRS in its effort to collect taxes, and they therefore could be convicted under § 371 only if they violated a specific tax provision that would trigger the statute's offense clause. Prosecution and conviction on the non-specific conspiracy to defraud charge, they argue, violated their due process rights.

For several reasons, we find this argument unpersuasive. First, *Minarik*'s holding has been narrowly limited to the facts of that case, even by the circuit in which it was issued. *See, e.g., United States v. Mohney*, 949 F.2d 899, 903 (6th Cir.1991); ("*Minarik* ... created a limited rule to remedy the particular concerns raised by the facts of that case."); *United States v. Sturman*, 951 F.2d 1466, 1473–74 (6th Cir. 1991); *United States v. Bilzerian*, 926 F.2d 1285, 1301 (2d Cir.1991); *United States v. Reynolds*, 919 F.2d 435, 439 (7th Cir.1990). These courts have recognized that the primary problem in *Minarik* was not that the government charged defendants under the defraud clause, but that it repeatedly shifted its theory of the case and thus "used the defraud clause in a way that created great confusion about the conduct claimed to be illegal," *Minarik*, 875 F.2d at 1196. *See Reynolds*, 919 F.2d at 439; *Bilzerian*, 926 F.2d at 1301. In this case, there has been no such confusion; the government consistently has maintained that defendants sought to deceive the IRS through the money-laundering activities in which they participated.

Second, the facts in *Minarik* are distinguishable in a critical respect from this case. In *Minarik*, the conspiracy had a narrow object—concealment of assets upon which the IRS was empowered to levy—and arose from a single event (the sale of a house). This object was explicitly proscribed by a particular statute, 26 U.S.C. § 7206(4). In this case, however, the

government alleges that defendants participated in a longstanding and wide-ranging scheme to deceive the IRS regarding the amount and source of Caruana's assets. We borrow the language of the Sixth Circuit, which distinguished a similar complex conspiracy from the circumstances present in *Minarik*, a case from its own circuit:

> This large conspiracy involved many events which were intended to make the IRS impotent. No provision of the Tax Code covers the totality and scope of the conspiracy. This was not a conspiracy to violate specific provisions of the Tax Code but one to prevent the IRS from ever being abl_ to enforce the Code against the defendants. Only the defraud clause can adequately cover all the nuances of a conspiracy of the magnitude this case addresses.

*Sturman*, at 1473.

■ Finally, we reject defendants' contention that, because money laundering was legal at the time they acted, they had no duty to refrain from such conduct and could not be prosecuted for it under § 371's defraud clause. Our caselaw makes it clear that lawful activity may furnish the basis for a conviction under § 371, *see United States v. Tarvers*, 833 F.2d 1068, 1075 (1st Cir.1987) ("The statute does not require that the means used to achieve the unlawful goal of the conspiracy be unlawful."). Moreover, we specifically have held that evidence of a defendant's knowing participation in laundering drug-derived profits will support a jury finding of conspiracy to impede the IRS in its collection of taxes. *See id.* at 1076; *United States v. Cambara*, 902 F.2d 144, 146–47 (1st Cir. 1990). *See also United States v. Browning*, 723 F.2d 1544, 1549 (11th Cir.1984) (defendant's knowing participation in money laundering scheme, combined with co-conspirator's stated purpose to defraud IRS, supports defendant's conviction for "overall scheme" to impede IRS).

■ We further find unpersuasive defendants' asserted lack of "fair warning" that their "legal" conduct could be the basis for a criminal prosecution. The statutory prohibition against defrauding the government adequately put defendants on notice that a scheme designed to frustrate tax collection was prohibited. Unlike the situation in *Minarik*, defendants' notice was not obfuscated by a confusing prosecution.

Thus, so long as the record contains sufficient evidence for a jury to conclude beyond a reasonable doubt that defendants knowingly participated in laundering drug proceeds, inevitably hindering the IRS in its ability to collect Caruana's taxes, their convictions under § 371's defraud clause are unassailable. We now turn to the sufficiency issue.

### III. *Sufficiency of the Evidence*

■ To prove a conspiracy under 18 U.S.C. § 371, the government must furnish sufficient evidence of three essential elements: an agreement, the unlawful objective of the agreement, and an overt act in furtherance of the agreement. *Cambara*, 902 F.2d at 146. Defendants challenge the government's proof of the "unlawful objective" element. They claim that the evidence concerning their work for Caruana does not demonstrate an unlawful intent to evade the tax laws, but shows only that they performed legitimate legal services for a client with substantial resources.[2]

We do not so view the record. Under well-established precedent, the government did not need to show direct evidence of tax motivation. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) ("[P]articipation in a criminal conspiracy need not be proved by direct evidence."); *United States v. Hilton*, 894 F.2d 485, 487 (1st Cir.1990) ("[T]he prosecution may prove its case by circumstantial evidence...."); *United States v. Nivica*, 887 F.2d 1110, 1113 (1st Cir.1989) ("In a fraud case, the government need not pro-

---

**2.** Defendants wisely refrain from challenging the sufficiency of the evidence on the other elements—an agreement and overt act—in light of well-established precedent permitting the government to prove a tacit agreement circum-

stantially through evidence of joint actions, *see, e.g., United States v. Rivera–Santiago*, 872 F.2d 1073, 1079 (1st Cir.1989), and the substantial record evidence of their collaborations with Caruana.

duce direct proof of defendant's scienter in order to convict.").

If the government presented sufficient evidence to demonstrate that Hurley and Burnett knew their transactions for Caruana involved illegal drug proceeds, the jury would have had a circumstantial basis for inferring that defendants—both sophisticated attorneys—understood that Caruana was conducting business in an unorthodox manner in order to conceal his criminal conduct and avoid paying taxes on his profits. *See United States v. Sanzo*, 673 F.2d 64, 69 (2d Cir.1982).[3] Such evidence additionally would permit the jury to find that, in performing the legal work necessary to hide Caruana's drug-derived income from the government, defendants were willing participants in the tax evasion scheme. This would be enough to support their convictions for conspiracy to impede the IRS under § 371. *See Tarvers*, 833 F.2d at 1075.

We believe that the record contains adequate evidence that Hurley and Burnett knew the source of Caruana's wealth. We consider each defendant in turn.

*Hurley.* The government argues that the record contains both direct evidence of Hurley's knowledge of Caruana's drug dealing, in the form of testimony from witness Katz,[4] and circumstantial evidence arising from Hurley's ongoing involvement in Caruana's money laundering transactions.

Katz testified that, upon Caruana's recommendation, he met with Hurley in early 1980 and told the lawyer that he was seeking ways to "legitimize" money he had earned from "doing the deals" with Caruana. Later that year, at Caruana's home, Hurley explained to Katz, at Caruana's request, the "technical" aspects of setting up offshore companies "to filter the money into them." Following that discussion, Caruana gave Hurley a paper bag containing $25,000 in cash to cover expenses incurred in setting up a corporation for Katz, telling Hurley that the money came "from Frank's load"—a reference to another drug dealer.

This evidence on its own strongly suggests Hurley's awareness of Caruana's drug dealing. Complementing this is evidence of Hurley's participation in a series of unconventional business transactions. We describe several of these, emphasizing that they do not exhaust the list.

Early in the relationship between the two men, Hurley was involved in a transaction in which Caruana gave a convicted drug trafficker $100,000 in cash in exchange for a one percent interest in a Michigan oil and gas lease.[5] Over a seven-year period, Hurley received monthly royalty checks resulting from that deal that he forwarded to the Bahamas for deposit in one of the front company accounts. In June 1979, Hurley witnessed in his office the signing of a $250,000 promissory note in favor of another Caruana trust. Following the signing, Hurley, Caruana and the borrower went to

3. Sufficient evidence existed to permit the jury to conclude that Caruana had no genuine intent to disclose and pay taxes on his illegal earnings. Arnold Katz, one of Caruana's drug distributors, testified that he and Caruana discussed the procedure for "how to protect the money, how to get money back to the U.S., how to filter it out and then filter it back in without raising the attention of the IRS and the Government." [Tr. 6:36] Moreover, despite his submission of letters to the IRS saying that he would "conform to his tax-related obligations whenever that conformity does not waive or is not inconsistent with his Fifth Amendment rights," he failed to reveal even the *amount* of his income or to pay any taxes throughout the time of the charged conspiracy.

4. Katz was arrested in 1981 and eventually agreed to cooperate with the government in exchange for a reduction of his sentence to time served. A key witness for the government at defendants' trial, Katz spent approximately five and one-half months in jail.

5. The testimony of Peter Krutschewski, the recipient of the cash, fluctuated in describing Hurley's role. At one point, he stated that he believed that Hurley may have been present when the money was transferred, *see* Tr. 19–14. He later testified, however, that "[Hurley] wasn't privy to when the money transpired[sic]," but he thought that Hurley was "in the area," *id.* at 55. Krutschewski's grand jury testimony, which was read at trial, included the following statements: "He was at the meeting, he was in the office. Whether he was present when the $100,000 was passed or given to me in the briefcase, I'm not sure." *Id.* at 54–55.

Caruana's home, where Caruana gave the borrower approximately $100,000 in currency out of a briefcase brought into the room by two men who also had been carrying suitcases.

The government emphasizes Hurley's role in a venture involving Bay State Gold & Silver Exchange, Inc., a Plymouth, Massachusetts company that in the summer of 1980 was a newly created business. In late July or early August, approximately one month after evidence showed that the Bahamian Cabinet minister brought $1 million of Caruana's currency to the Bahamas, Bay State Gold borrowed $800,000 from one of Caruana's Bahamian companies. The purported security for the loan was stock of the as yet unincorporated Bay State Gold. Hurley helped to arrange the loan and incorporated Bay State Gold several weeks after the $800,000 had been wired to the company's account.[6]

Hurley makes much of the fact that the transactions in which he participated were not "shams," in that they generally involved valid deals with third parties entirely outside of Caruana's criminal enterprises and were accompanied by proper documentation. The legitimacy of each transaction, on its own, is not the issue before us, however; the question is whether Hurley understood that these facially proper undertakings were part of a scheme to insulate Caruana and his money from the government.

In our view, a reasonable jury could have found that Hurley's repeated involvement in such deals over an extended period of time, sometimes with Caruana physically present for transactions, suggested that he knew of, and was hired to assist in, Caruana's effort to mask drug proceeds. We note, moreover, that Hurley and Caruana had more than a formal business affiliation. Early in the conspiracy period, Hurley lived for several months in one of the houses in Caruana's compound in Massachusetts. At that time, Caruana was actively engaged in drug dealing and had no apparent other source of income. When the series of business transactions is viewed against the backdrop of Katz's testimony and Hurley's sustained proximity to Caruana, we are constrained to conclude that the jury permissibly inferred his knowing participation in the conspiracy.

*Burnett.* The evidence pointing to Burnett's awareness of Caruana's drug dealing was not as explicit as that involving Hurley, undoubtedly because Burnett's involvement with Caruana did not begin until after the drug ventures had ended. Nevertheless, the circumstantial evidence made the inference of his knowledge equally permissible.

Perhaps the most telling fact regarding Burnett's knowledge was that two weeks before Caruana's scheduled trial on marijuana importation charges in 1984, and just before Caruana fled, Burnett visited him in Boston. After Caruana became a fugitive, Burnett remained in close contact with, and continued to transact business for, Caruana. The two men communicated by computer, using a code name to refer to Caruana. It is also of note that Burnett, like Hurley, appeared to share a personal as well as professional relationship with Caruana. In 1983, Burnett flew with Caruana to the Bahamas to gamble.[7]

Defendants correctly point out that these contacts furnish no direct proof of Bur-

---

**6.** Defense counsel asserted at argument that the evidence showed that Hurley had been involved only in the incorporation of Bay State Gold and not in the questionable loan transaction. Our reading of the transcript, however, does not lead us to so clearly partition Hurley's role. Richard Binder, the owner of Bay State Gold, testified that at one meeting with Hurley he discussed incorporating his business and at another meeting he discussed "pledging the stock of the corporation for the loan." Tr. 8–160. Although Binder testified that the incorporation meeting occurred first, the documents show that the loan proceeds were received before the business was incorporated. *See* Exs. 13.3–13.7.

**7.** The record also contains evidence that Burnett attended proceedings of a Bahamian Commission of Inquiry investigating drug smuggling and public corruption on the island, and that he later received a copy of the Commission's report. Caruana's activities were among those being probed. Although the record fails to reflect the precise date of his attendance, it would have been sometime in 1984 or early 1985.

nett's knowledge of Caruana's illicit business. The jury was permitted to infer, however, that at least when Caruana fled to avoid trial on drug charges in 1984, Burnett must have realized that his client was a drug distributor and that his financial dealings were not simply idiosyncratic, but arose from a scheme to conceal illegal conduct and profits.

This inference of knowledge is clearly reasonable when viewed in light of the lengthy history of transactions on which Burnett worked, both before and after Caruana became a fugitive. Again, as with Hurley's endeavors, we make no attempt to be exhaustive in describing Burnett's activities.

The association between the two men began in 1982 when Burnett took part in Caruana's purchase of property in Florida through a realty trust and with a straw buyer.[8] In 1983, Burnett approved a transaction involving the realty trust that produced $150,000 in cash for Caruana. In late 1984, Caruana instructed Burnett, by computer, to wire him $31,000 from an individual in Panama in the form of five cashier checks made payable to a third party. A short time later, a Florida bank issued five such checks, totalling $30,000; receipts for three of them were found among Caruana's seized records. The record further showed that, in 1985, Rubie Nottage sent all of Caruana's money laundering records to Burnett. The records ultimately were forwarded to Caruana in Connecticut and subsequently were seized by the government.

A transaction in early 1986, in which a Caruana front company obtained insurance proceeds from the crash of a Bar Harbor Airways plane, is particularly revealing of illicit motive. Bar Harbor had borrowed funds from a Bahamian company named Neon Tetra, which was under scrutiny at the time of the plane crash as a result of a probe into Caruana's drug smuggling activ-

ities. Evidently to avoid raising further suspicions about the Bahamian Neon Tetra, a different corporation named Neon Tetra Investments, Ltd. S.A. was formed in Panama on February 18, 1986.[9] It was in Burnett's office, two days later, that Bar Harbor signed over the insurance proceeds to a Panamanian attorney in exchange for a release from this new Neon Tetra. Later that year, a Panamanian bank issued 50 checks in the amount of $7,500 each, made payable to Serge DeConinck, a past boyfriend of a woman who knew and worked with Burnett. Caruana deposited 31 of these checks in a Connecticut bank account.

As with Hurley, we emphasize that evidence of Burnett's involvement in any single deal might not have provided a sufficient basis for his conviction. It is the confluence of factors—the duration of Burnett's association with Caruana, the routinely odd transactions and, most significantly, Burnett's visit on the eve of Caruana's drug trial followed by the secretive communications—that permitted the jury to conclude that Burnett was fully aware of, and a full participant in, the underlying fraudulent scheme. *See United States v. Nivica*, 887 F.2d 1110, 1114 (1st Cir.1989) ("[D]efendant's involvement in the operations of the enterprise was so pervasive that his knowledge of its illegal nature became reasonably certain."); *United States v. Fusaro*, 708 F.2d 17, 21 (1st Cir. 1983) (in prosecution for conspiracy to defraud FDIC under § 371, "[attorney's] participation in so many aspects of the scheme as well as his attempts to cover up the scheme ... provides the basis for the inference that he acted with the requisite intent and knowledge").

Having concluded that the evidence recited above was sufficient to support the jury's verdicts, we necessarily reject defendants' claims that this case is materially distinguishable from three earlier First Cir-

---

8. The straw, James Burke, testified that he subsequently found out that the title actually was in Burnett's name as trustee, with Burke as the beneficiary. [Tr. 19–130]

9. The government provided us with no record evidence of the date of incorporation for the new Neon Tetra. Defendants, however, ac-

knowledge formation of a "successor" Neon Tetra in Panama. The fact that this company was formed in haste is borne out by the misspelling of the company name on the corporate seal that appears on the signed form releasing Bar Harbor from the loan. *See* Ex. 11.18.

cuit cases, relied upon by the government, in which defendants were convicted under § 371 for conspiracy to defraud the IRS based on schemes to launder drug money. *See Cambara*, 902 F.2d at 144; *United States v. Lizotte*, 856 F.2d 341 (1st Cir. 1988); *Tarvers*, 833 F.2d at 1068.[10] Nor are defendants helped by the cases they cite in which courts have invalidated convictions under § 371. We note, in particular, *United States v. Krasovich*, 819 F.2d 253 (9th Cir.1987), in which defendant's conviction for conspiring to defraud the IRS was based entirely on his having registered a truck in his own name with knowledge that the true owner was involved in drug dealing. Reversing the conviction, the Ninth Circuit held that "there was no evidence, direct or circumstantial, ... [that defendant] intended or agreed with anyone else to impede the Internal Revenue Service in its collection of taxes," *id.* at 254. Had the record in this case contained only evidence of a single episode such as this, the jury's verdict might have been impeachable. Such is not the record here.

Accordingly, the judgments of conviction on Count I are AFFIRMED.

---

**10.** Defendants assert four points of distinction that they claim require us to reverse their convictions: (1) they neither participated in the drug trafficking nor knew the drug source of the money they handled; (2) none of the conspirators explicitly stated a motive to defraud the IRS; (3) they did not structure transactions to evade reporting requirements, and (4) they did not falsify records or engage in sham transactions. Our discussion above fully disposes of three of these points. With respect to point three, we note only that defendants' failure specifically to evade IRS reporting requirements for the deals they consummated does not prevent those transactions from serving as the basis for a broader charge of fraud against the IRS.