UNITED STATES of America,

v.

Pornpimol KANCHANALAK

and

Duangnet Kronenberg, Defendants.

No. CR. 98–0241(PLF).

United States District Court,
District of Columbia.

Feb. 3, 1999.

Jonathan Biran, Campaign Finance Task Force, Criminal Div., Washington, DC, for U.S.

Reid Weingarten, Steptoe & Johnson, Washington, DC, James Hamilton, Swidler & Berlin, Washington, DC, for Defendants.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This case is before the Court on the supplemental briefs of the parties on defendants' Motion No. 1, to dismiss Counts 5 and 6 (false statements), and the government's motion for reconsideration of the Court's dismissal of Counts 4 and 9 (false statements), as well as on defendants' Motion No. 2, to dismiss Count 1 (conspiracy), or, in the alternative, to strike prejudicial surplusage, and defendants' Motion No. 3, to dismiss Counts 1–14 as preempted by FECA. The Court heard argument on January 20 and January 25, 1999.

The Court concludes that the reasoning in its opinions in *United States v. Hsia,* 24 F.Supp.2d 33 (D.D.C.1998), and *United States v. Trie,* 23 F.Supp.2d 55 (D.D.C. 1998), compels dismissal of all of the false statements counts against defendant Pornpimol "Pauline" Kanchanalak and Count 4 against defendant Duangnet "Georgie" Kronenberg. The Court further concludes that Counts 5 and 9 against Ms. Kronenberg also must be dismissed. The government's motion for reconsideration therefore will be denied, and defendants' Motion No. 1 will be granted, except insofar as it seeks dismissal of Count 6 against Ms. Kronenberg. For essentially the reasons stated in the Court's opinions in *Hsia* and *Trie,* defendants' Motion No. 2 and Motion No. 3 also will be denied.

## I. FALSE STATEMENTS COUNTS

The false statements counts charge Ms. Kanchanalak and Ms. Kronenberg with "knowingly and willfully caus[ing] the submission of material false statements to the FEC, in that defendants caused the responsible officials of ... political committees to file reports with the FEC that listed ... individuals as having provided funds to such political committees ... when, as defendants then and there well knew, the named individuals were not the actual sources of those funds," in violation

of 18 U.S.C. §§ 1001 and 2(b). *See* Superseding Indictment at 24. The Court already has concluded that "Counts 2–4 and 7–14 of the Superseding Indictment in this case are virtually· indistinguishable from the allegations at issue in *Hsia* and *Trie*." *See* Memorandum Opinion and Order of December 31, 1998 at 2. For the reasons stated at great length in *Hsia*, and in abbreviated fashion in *Trie*, the Court therefore dismissed those counts. With respect to Counts 5 and 6, however, the Court reserved ruling because "[u]nder the reasoning articulated by the Court in *United States v. Hsia*, 24 F.Supp.2d at 60 n. 30, it is possible that Sections 1001 and 2(b) could constitutionally be applied to the conduct alleged in Counts 5 and 6." *Id.* at 5. The Court therefore directed the government to

> provide a supplemental opposition setting forth any reasons *within* the framework set forth in *Hsia* and *Trie* that Counts 5 and 6 should not be dismissed. The supplemental opposition may provide further legal argument, particularly with respect to the impact on each defendant of the factual allegations described above in light of footnote 30 of *Hsia* and/or it may provide additional factual information in the nature of a limited bill of particulars.

*Id.* at 6.

The government has filed a supplemental opposition and a limited bill of particulars in response to the Court's Order. It concedes that in view of the evidence that it has available, Ms. Kanchanalak "cannot be charged with causing the false statement alleged in Count Six" under the *Hsia* framework. Govt's Supp. Opp. at 3 n. 2. It maintains, however, that under *Hsia*, Count Five "can constitutionally be applied to both defendants, and Count Six can constitutionally be applied to defendant Kronenberg." *Id.* at 5. In its motion for partial reconsideration, the government also argues that Sections 1001 and 2(b) can constitutionally be applied to the conduct alleged in Counts 4 and 9 of the Superseding Indictment.

### A.   Counts 4, 5 and 9;  The Democratic National Committee

Counts 4, 5 and 9 of the Superseding Indictment all relate to a series of donations or contributions allegedly made to the Democratic National Committee ("DNC") between March 17, 1994 and October 14, 1994 to fulfill Ms. Pauline Kanchanalak's monetary obligations to become first a trustee and later a managing trustee of the Democratic Party. *See* Superseding Indictment at 6, 12, 15; Bill of Particulars at ¶¶ 2, 3, 14, 15. In each instance, the Superseding Indictment alleges that a contribution or donation was made to the DNC "by way of checks drawn on Praitun Kanchanalak's account at First Virginia Bank ... using BCI USA [corporate] funds that had been deposited into Praitun Kanchanalak's First Virginia account via Duangnet Kronenberg's personal account at First Union National Bank." Superseding Indictment at 12. Praitun Kanchanalak, an unindicted co-conspirator, is Ms. Kronenberg's mother and Ms. Pauline Kanchanalak's mother-in-law.[1] In each instance, the check was imprinted "P. Kanchanalak," and Praitun Kanchanalak signed it "P. Kanchanalak." *Id.* According to the Indictment, this was intended to cause the recipient political committee to believe that the funds were coming from an account held by Pauline Kanchanalak. *Id.* Count 4 relates to a $15,000 check dated March 21, 1994, Count 5 to a $15,000 check dated April 22, 1994, and Count 9 to a $32,500 check dated October 20, 1994.[2] All the checks were

---

1. Throughout this Opinion, Ms. Praitun Kanchanalak always is referred to by her full name. Defendant Pauline Kanchanalak is referred to either by her full name or as Ms. Kanchanalak.

2. Count 5 also alleges false statements in connection with checks attributed by the DNC to Ms. Kronenberg. *See* Superseding Indictment at 25. The government has conceded, however, that under the *Hsia* framework, "the only donation which is relevant to the

**4**

payable to the Democratic National Committee. *Id.* at 25. The "Person Identified in [the DNC's] Report [to the FEC] as Having Provided Funds" for each check was Pauline Kanchanalak. *Id.*

With respect to Counts 4 and 5, the government alleges that Ms. Lauren Supina, a DNC fundraiser, sent a letter to Ms. Kanchanalak on April 11, 1994 regarding the status of her position as a DNC Trustee. *See* Bill of Particulars at ¶¶ 1, 12. In the letter, Ms. Supina stated that she had "been under the impression that you would become a full DNC Trustee through the Women's Leadership Forum by contributing $15,000 in both March and April.... This agreement was set up through Georgie [Kronenberg] and I assumed you authorized it." *Id.*[3] Approximately one week later, Ms. Kronenberg allegedly conveyed a $15,000 check to the DNC drawn on Praitun Kanchanalak's account and signed "P. Kanchanalak," with an accompanying memorandum in which Ms. Kronenberg stated:

> Enclosed please find a check for $15,000.00 payable to DNC (non-federal) as part of Ms. Kanchanalak's contribution to the DNC Trustee Program. As earlier discussed with you, the remaining $20,000 will be payable at the end of May 1994 which will conclude the total contribution of $50,000.
>
> Please also mail me the Federal Election Commission Report Form.

Bill of Particulars at ¶ 2. Ms. Supina testified in the grand jury pursuant to a subpoena that when she received the April check, she understood "P. Kanchanalak" to be Pauline Kanchanalak. *Id.* at ¶ 5.

The government contends that "it can be inferred from Lauren Supina's letter ... that defendant Kronenberg earlier had told Ms. Supina that Pauline Kanchanalak would be donating $15,000 to the DNC in April 1994" and that by sending the check

and the accompanying memorandum, Ms. Kronenberg affirmatively misled Ms. Supina to believe that the source of the funds was Pauline Kanchanalak and the money was from her account. Govt's Supp. Opp. at 6. The government further contends that a jury "could reasonably infer that defendant Kronenberg made this affirmative misrepresentation to Ms. Supina at the behest of defendant Kanchanalak, given the fact that Ms. Supina's April 11 letter was addressed to defendant Kanchanalak and given other evidence alleged in the Superseding Indictment and the Limited Bill of Particulars that defendant Kanchanalak was the organizer of Defendants' alleged unlawful scheme." *Id.*

With respect to Count 4, the government alleges in its limited bill of particulars (although not in the Superseding Indictment itself) that a check numbered 127 was drawn on Ms. Praitun Kanchanalak's account and made payable to the "Democratic National Committee–WLF." Bill of Particulars at ¶ 13. The check was imprinted "P. Kanchanalak," but Praitun Kanchanalak allegedly signed the check "Praitun Kanchanalak" rather than "P. Kanchanalak," and the check was never sent. *Id.* Instead, check number 128 imprinted "P. Kanchanalak" allegedly was drawn on Ms. Praitun Kanchanalak's account, again made payable to the Democratic National Committee–WLF, signed "P. Kanchanalak" by Praitun Kanchanalak and mailed to the DNC. *Id.* at ¶ 14. The government maintains that the circumstances under which check number 127 was not sent and check number 128 instead was sent support an inference that the checks deliberately were imprinted and signed "P. Kanchanalak" in order to mislead the DNC into believing that the check sent to the DNC was drawn on

charge against Defendants in Count Five is the April 1994 donation reported to the FEC as having been made by Pauline Kanchanalak." Govt's Supp. Opp. at 6 n. 4.

3. The reference to a March contribution of $15,000 is to the check that is the basis of the Count 4 false statements charge.

Pauline Kanchanalak's account and was signed by Pauline Kanchanalak.

As to Count 9, the government alleges that on or about October 5, 1994, Ms. Supina faxed Ms. Kanchanalak a memorandum regarding Ms. Kanchanalak's "WLF Managing Trustee Dues." Bill of Particulars at ¶ 19. The memorandum instructed Ms. Kanchanalak to fulfill her dues obligation of $50,000 by sending checks payable to certain state democratic parties in specified amounts and a check made payable to the Democratic National Committee in the amount of $32,500. *Id.*[4] On October 13, 1994, Ms. Kronenberg allegedly sent a check imprinted "P. Kanchanalak" that had been signed "P. Kanchanalak" by Ms. Praitun Kanchanalak to the DNC. The check was accompanied by a transmittal letter from Ms. Kronenberg stating that the check " 'represent[ed] the last payment for the 1994 Second Annual Women's Leadership Forum Conference.' " *Id.* at ¶ 20. The government maintains that "[i]n the context of the correspondence between Ms. Supina and defendant Kanchanalak, it can be inferred that defendant Kronenberg meant Ms. Supina to believe that the payment was coming from Pauline Kanchanalak." Govt's Mot. for Partial Reconsideration at 10.

■ What is apparent from the foregoing description of the Indictment and the limited bill of particulars is that the government has alleged no affirmative conduct by Ms. Kanchanalak with respect to "causing" the making of false statements by the DNC. Therefore, "any finding that the conduct alleged in the indictment constitutes a false statements offense would require an impermissibly strained reading of Section 1001 and 2(b)." *See United States v. Hsia,* 24 F.Supp.2d at 54. In fact, the government's theory of causation with respect to Ms. Kanchanalak is, if possible, even more attenuated than that advanced by the government in the *Hsia* case. In *Hsia,* at least there were allegations that Ms. Hsia solicited conduit contributions, asked others to sign checks and mailed or delivered checks. *See id.* at 61. Here the government contends only that based on the letter that Lauren Supina at the DNC wrote to Ms. Kanchanalak, "it can be inferred" that Ms. Kronenberg told Ms. Supina that Pauline Kanchanalak was going to be the source of a certain donation and that it would be "reasonable" to infer that it was "at the behest" of Ms. Kanchanalak that Ms. Kronenberg made the statement that it can be inferred that Ms. Kronenberg made to Ms. Supina. In such a First Amendment-sensitive area as the regulation of campaign contributions by felony prosecution, it simply is constitutionally impermissible to pile so many inferences on top of each other. *See United States v. Hsia,* 24 F.Supp.2d at 54–62. In the absence of a single allegation of any affirmative conduct by Ms. Kanchanalak that could have "cause[d]" the DNC to submit allegedly false reports to the FEC, Count 5 will be dismissed against Ms. Kanchanalak, and the government's motion for reconsideration with respect to Counts 4 and 9 will be denied as to her.

■ Nor does Count 4 allege any affirmative conduct by Ms. Kronenberg. In Count 4, the only alleged affirmative conduct was the writing of a letter by Ms. Supina and the transmission by someone of check number 128 signed "P. Kanchanalak." Unlike the situation described in the bill of particulars with respect to Counts 5

---

4. It is not clear that it was ever Ms. Supina's, Ms. Kronenberg's or Ms. Kanchanalak's understanding that Ms. Kanchanalak had to be the source of the funds for these checks. Ms. Supina apparently testified before the grand jury that the conference co-chairs "were asked to raise or write $50,000 for the conference." Bill of Particulars at 6–7 n. 2. When asked what she meant by the term "write,"

Ms. Supina responded "[w]rite meant they could either write a check, which in fundraising terms means it would be their personal check or if they were representing a company it could be a corporate check. And raising meant that they were going to get people they knew or people they didn't know, they were going to solicit funds." *Id.*

and 9, there was no cover letter or enclosure memorandum from Ms. Kronenberg. There in fact is no allegation or evidence as to who sent or delivered the check and no statements, written or oral, made by anyone in connection with its transmission to the DNC. Under the *Hsia* framework, absent any affirmative conduct by Ms. Kronenberg, the mere submission of the check is an insufficient basis for charging her with having "caused" the DNC to make an allegedly false statement. *See United States v. Hsia*, 24 F.Supp.2d at 62 ("Absent some additional affirmative conduct, Ms. Hsia's solicitation and delivery or mailing of checks could not have 'caused' the political committees to make false statements"). The fact that check number 127, identical to check number 128 except that it was signed "Praitun Kanchanalak" rather than "P. Kanchanalak," never was sent may have been relevant and persuasive evidence of intent if there were conduct sufficient to get the case to trial, but it does not provide affirmative conduct sufficient to surmount the *Hsia* hurdle in the first place. Since check number 127 was never sent to the DNC, it adds nothing to what the DNC could have believed at the time it filed its quarterly report and therefore this evidence is irrelevant to whether Ms. Kronenberg "caused" the DNC to make false statements to the FEC. The government's motion for reconsideration of the dismissal of Count 4 against Ms. Kronenberg therefore will be denied.

■ The situation with respect to Counts 5 and 9 against Ms. Kronenberg is slightly different. In each case, the government has alleged affirmative conduct by Ms. Kronenberg, in addition to the mere submission of a check, that allegedly misled the DNC into believing that Pauline Kanchanalak was the true source of the funds and thus "caused" the DNC to list Ms. Kanchanalak on the DNC's quarterly reports to the FEC. Ms. Kronenberg contends that because the Superseding Indictment does not allege that she specifically asserted that she was the "true source" of the funds at issue, it is impermissible to prosecute her for a violation of Sections 1001 and 2(b) under the *Hsia* framework. Ms. Kronenberg misreads the *Hsia* decision.

It was the remoteness of Ms. Hsia's position in relation to the FEC, the case law with respect to "literal truth," the fact that a check is not a statement, and the willful intent hurdle which together made it impossible in *Hsia* to conclude that Sections 1001 and 2(b) could be applied consistently with the Constitution to the conduct alleged in Ms. Hsia's Indictment. *See United States v. Hsia*, 24 F.Supp.2d at 63. That is not to say, however, that a defendant can only "cause" a political committee to assert that he or she is the true source of a contribution if she specifically fills out a form stating that she is the true source of the contribution. If a defendant takes other affirmative steps intended to mislead that cause the political committee to believe that she is the true source of the contribution, that may well be sufficient to establish the causal nexus. The missing element in *Hsia*, however, was any allegation that Ms. Hsia took any affirmative step aside from soliciting, delivering or mailing checks—activities that, absent more, cannot "cause" a political committee to make any representation about the true source of the contribution to the FEC. *See id.* at 62. By contrast, in this case, the government has alleged affirmative conduct by Ms. Kronenberg and a causal connection between that conduct and the alleged false statements made by the DNC in Counts 5 and 9.

Unfortunately for the government, however, it faces a related and equally troubling problem with respect to Counts 5 and 9: finding a false statement. The government has asserted that the "false statement" that forms the basis of each count is the name of the donor, Pauline Kanchanalak, contained in the quarterly report filed by the DNC. As in *Hsia*, the government's theory of a false statement is that because the DNC did not list the

name of the "true source" of the funds and instead reported Pauline Kanchanalak's name in its quarterly report to the FEC, the report was false. In *Hsia*, the Court stated that there at least was a "plausible argument that knowledgeable and sophisticated political committees or committee treasurers impliedly assert when they submit reports to the FEC that to the best of their knowledge the names listed on the reports are the 'true sources' of the contributions" and that the reports therefore contained false statements when they listed the names of conduit contributors. *United States v. Hsia*, 24 F.Supp.2d at 59. That barely "plausible argument," however, relied heavily on the definitions and operation of FECA, definitions that apply only to hard money "contributions" regulated by FECA. Because the alleged "false statements" in Counts 5 and 9 involve soft money donations rather than hard money contributions, there can be no such argument that Counts 5 and 9 allege false statements.[5]

FECA requires political committees to report, *inter alia*, "the identification of each person (other than a political committee) who makes a *contribution* to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year." 2 U.S.C. § 434 (emphasis added). The statute defines "identification" in the case of an individual, to mean "the name, the mailing address, and the occupation of such individual, as well as the name of his or her employer." 2 U.S.C. § 431(13)(A). A "contribution" is defined, in relevant part, to include "any gift, subscription, loan, ad-

vance, or deposit of money or anything of value made by any person for the purpose of influencing any election for *Federal office*." 2 U.S.C. § 431(8)(A) (emphasis added). These definitional provisions make clear that FECA, with only one exception not relevant here, applies only to hard money contributions.

While these statutory provisions, standing alone, contain no guidance with respect to whether the political committee is obligated to report the identity of the true source of funds or the identity of the person from whom it received a contribution check, FECA also provides that "[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person." 2 U.S.C. § 441f. As the Court concluded in *Hsia*, the language of that provision suggests that political committees may be obligated to report the identity of the "true source" of contributions in their quarterly reports, rather than the names of people who submit contributions or who write checks for contributions. *United States v. Hsia*, 24 F.Supp.2d at 60 ("there is an implication that the term 'contributor' means the true source, rather than the person whose name has been used"). On the thin reed of Section 441f, the government therefore has a "plausible argument" that a report submitted by a political committee to the FEC that lists the identity of a "conduit" or a person other than the true source of a *contribution* contains a false statement. *See id.* at 59–60.[6]

---

5. The government has acknowledged that the allegations in Count 9 relate only to a soft money donation. *See* Govt's Opp. to Defs' Motion No. 3 at 12. With respect to Count 5, the government has conceded that the only relevant donation is a $15,000 donation made in April 1994 to the DNC. *See supra* at —— n. 2. The Superseding Indictment alleges that the April 1994 donation was accompanied by a memorandum from Ms. Kronenberg that specified that the check was payable to "DNC

(non-federal)." Superseding Indictment at ¶ 16. The relevant Count 5 allegations therefore involve only a soft money donation.

6. FEC regulations provide no clearer guidance than FECA itself with respect to whether a political committee is required to report the true source of contributions in its reports to the FEC. Most of the regulations simply mirror the language of the statute, except for a regulation that provides that "[a]bsent evidence to the contrary, any contribution made

The same is not true for soft money *donations,* however. FEC regulations require national political committees to:

disclose in a memo Schedule A information about each individual, committee, corporation, labor organization, or other entity that donates an aggregate amount in excess of $200 in a calendar year to the committee's non-federal account(s). This information shall include the donating individual's or entity's name, mailing address, occupation or type of business, and the date of receipt and amount of any such donation.

11 C.F.R. § 104.8(e). This reporting requirement is a stand-alone provision in the regulations. Nothing in the statute refers to this reporting requirement, and the government has conceded that the provision of FECA prohibiting conduit contributions, the one provision that arguably provides the basis for a false assertion on the contribution reports, does not apply to soft money donations. *See United States v. Trie,* 23 F.Supp.2d at 59–60 ("The word *contribution* is a term of art defined by the statute, and the statutory definition applies only to elections for *federal office* ... it therefore does not encompass soft money donations"). Moreover, the regulations provide no indication of whether a national party committee is obligated to report the "true source" of any such donation. In fact, the word "donates" is never defined in either the statute or the regulations. The government therefore lacks any basis to argue that the statute and regulations require a political committee to list the names of "true sources" of soft money donations in its reports to the FEC.

In the case of soft money donations, it is more than just "a battle to find the false statements in the indictment," *see United States v. Hsia,* 24 F.Supp.2d at 58; it is

impossible to do so. Since falsity is an essential element of a Section 1001 offense, *United States v. Milton,* 8 F.3d 39, 45 (D.C.Cir.1993), *cert. denied,* 513 U.S. 919, 115 S.Ct. 299, 130 L.Ed.2d 212 (1994), the Court cannot conclude, in the First Amendment-sensitive area in which this Superseding Indictment operates, that Counts 5 and 9 sufficiently allege false statements within the meaning of Section 1001. *Cf. United States v. Hsia,* 24 F.Supp.2d at 54–55, 58–60. Ms. Kronenberg's motion with respect to Count 5 therefore will be granted, and the government's motion for reconsideration with respect to Count 9 will be denied.

### B. *Count 6: Friends of John Glenn*

█ Count 6 involves a separate contribution made by Ms. Kronenberg.[7] In May 1994, Senator John Glenn allegedly wrote to Ms. Kanchanalak regarding a fundraiser to benefit Friends of John Glenn. Bill of Particulars at ¶ 7. Senator Glenn followed up the letter with a fax on May 21, 1994. *Id.* at ¶ 8. Ms. Kronenberg allegedly "came into possession of" the fax from Senator Glenn to Ms. Kanchanalak. Govt's Supp. Opp. at 9. In response to the fax, Ms. Kronenberg allegedly wrote a check for $1,000, for which she allegedly was reimbursed by BCI–USA. Superseding Indictment at 13. The Superseding Indictment states that at the time she sent the check, Ms. Kronenberg "provided Friends of John Glenn with information about herself on a form which noted that the requested information was 'required by the Federal Election Commission.'" *Id.* at 14. The limited bill of particulars specifies that Ms. Kronenberg

filled out, signed, and returned to the Friends of John Glenn an R.S.V.P. card in connection with the fundraising event to which Senator Glenn had invited de-

---

by check, money order, or any other written instrument shall be reported as a contribution by the last person signing the instrument prior to delivery to the candidate or committee." 11 C.F.R. § 104.8(c).

7. The government has conceded that under the framework set forth in *Hsia,* Ms. Kanchanalak cannot be charged in Count 6 with a violation of Sections 1001 and 2(b) and therefore does not oppose dismissal of that Count with respect to Ms. Kanchanalak.

fendant Kanchanalak. On this R.S.V.P. card ... defendant Kronenberg checked the box next to the following preprinted statement: "Yes, I/we will attend the May 25th Gala, with Bill Clinton in honor of John and Annie Glenn. Enclosed is a contribution of $1,000." Defendant Kronenberg caused to be typed on this R.S.V.P. card her name, address, and home telephone number. The R.S.V.P. card included a pre-printed message that the information being requested was "required by the Federal Election Commission." The R.S.V.P. card also contained a pre-printed message notifying potential contributors that "[c]orporate checks cannot be accepted."

Bill of Particulars at ¶ 10. On a line at the bottom of the R.S.V.P. card, next to the words "Signature of Contributor(s)," is handwritten "D. Georgie Kronenberg."

Count 6 is the only false statements count in the Superseding Indictment that appears adequately to allege both affirmative conduct and false statements. Count 6 clearly involves a hard money contribution, that is something of value given "for the purpose of influencing any election for Federal office." *See* 2 U.S.C. § 431(8)(A). Ms. Kronenberg allegedly took an affirmative step in that she completed and returned the R.S.V.P. card, including her signature as "contributor(s)." That affirmative step allegedly "caused" the Friends of John Glenn Committee to identify Ms. Kronenberg as the contributor in its quarterly report to the FEC. Since BCI–USA allegedly provided the funds for this contribution, the quarterly report of the Friends of John Glenn Committee contained an arguably false statement. *See supra* at 7–8. Ms. Kronenberg's motion therefore will be denied insofar as it seeks dismissal of Count 6.

## II. DEFENDANTS' MOTION NO. 2, TO DISMISS COUNT 1 OR, IN THE ALTERNATIVE, TO STRIKE PREJUDICIAL SURPLUSAGE

Count 1 alleges that defendants conspired to impair, impede and defeat the lawful functions and duties of the Federal Election Commission in violation of 18 U.S.C. § 371. Defendants contend that Count 1 must be dismissed for failure to state an offense or, in the alternative, that the allegations of Count 1 relating to soft money donations should be stricken as prejudicial surplusage.

Section 371 contains two distinct clauses that criminalize two distinct types of conspiracies: (1) conspiracies to commit an offense specifically defined elsewhere in the federal criminal code; and (2) conspiracies to defraud the United States or one of its agencies "in any manner or for any purpose." 18 U.S.C. § 371. The government has charged defendants under the "defraud" clause of Section 371, and it therefore need only show that (1) they entered into an agreement, (2) to obstruct a lawful function of the government or an agency of the government, (3) by deceitful or dishonest means, and (4) at least one overt act was taken in furtherance of that conspiracy. *See United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1327, 137 L.Ed.2d 488 (1997); *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993); *United States v. Hurley*, 957 F.2d 1, 3 (1st Cir.), *cert. denied,* 506 U.S. 817, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992). Because Section 371 by its terms proscribes "defraud[ing] the United States, or any agency thereof in any manner or for any purpose," and because the object or purpose of a conspiracy charged under the "defraud" clause is to "defraud" the United States or an agency thereof, the object necessarily is illegal, regardless of whether such object also is illegal by virtue of a separate statute. Thus, it is said that "[n]either the conspiracy's goal nor the means used to achieve it need to be independently illegal." *United States v. Caldwell*, 989 F.2d at 1059. *See United States v. Hurley*, 957 F.2d at 4 ("[L]awful activity may furnish the basis for a conviction under § 371"). "[S]o long as deceitful or

dishonest means are employed to obstruct governmental functions, the impairment 'need not involve the violation of a separate statute,'" *United States v. Ballistrea,* 101 F.3d at 832, and the deceitful or dishonest means employed need not be unlawful in and of themselves. *Id.* at 833.

■ Defendants contend that because they had no obligation to report their identity to the FEC or to reveal their identity to the political committees, *see Republican Nat'l Comm. v. FEC,* 76 F.3d 400, 406 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997), as a matter of law they could not have impaired or impeded any function of the FEC. Defendants are incorrect. While they had no legal obligation to reveal their identity to the FEC or the political committees at issue, the Superseding Indictment does not charge the defendants with conspiracy to fail to reveal their names; instead it alleges a conspiratorial agreement to use deceptive or deceitful means to prevent the FEC from performing its lawful reporting function. The Superseding Indictment alleges that the defendants entered into an agreement to make contributions that were prohibited by the Federal Election Campaign Act "without being detected by the FEC or the public," Superseding Indictment at 6–7, and that they took a number of affirmative overt acts in furtherance of that conspiracy, thereby impairing the FEC's reporting function. *Id.* at 9–23. Those allegations are sufficient to state a conspiracy under the "defraud" clause of 18 U.S.C. § 371.

In order to obtain a conviction against defendants, of course, the government will have to prove each of the essential elements of a conspiracy beyond a reasonable doubt, including proving that the defendants used deceitful or dishonest means to obstruct the lawful reporting function of the FEC, and the jury will be so instructed. *See United States v. Caldwell,* 989 F.2d at 1060; *United States v. Haga,* 821 F.2d 1036, 1041 (5th Cir.1987); *United States v. Hsia,* 24 F.Supp.2d at 53. For purposes of a motion to dismiss, however, the allegations in the Indictment are sufficient, and the Court therefore will deny defendants' motion to dismiss Count 1.

■ Finally, defendants contend that if Count 1 is not dismissed, the allegations related to soft money donations are prejudicial surplusage and should be stricken. "Material that can fairly be described as 'surplus' may only be stricken if it is irrelevant and prejudicial." *United States v. Oakar,* 111 F.3d 146, 157 (D.C.Cir.1997). *See United States v. Trie,* 21 F.Supp.2d 7, 19 (D.D.C.1998). While the Court already has ruled that the FECA provisions at issue do not apply to soft money donations, allegations of conduct related to soft money donations are relevant insofar as they may establish a pattern of conduct by defendants and help support the allegations with respect to hard money. For instance, as the government has noted, in order to prove that the corporation was the true source of the contributions at issue, it intends to provide evidence that Ms. Kronenberg could not possibly have funded all of the alleged contributions made from checks drawn on her account. Evidence of the amount of donations and contributions made from checks drawn on Ms. Kronenberg's account is relevant to establish the government's theory. Because the allegations with respect to soft money donations are relevant, the Court will not strike them from the Superseding Indictment. *See United States v. Trie,* 21 F.Supp.2d at 19.

## III. DEFENDANTS' MOTION NO. 3, TO DISMISS COUNTS 1–14 AS PREEMPTED BY THE FEDERAL ELECTION CAMPAIGN ACT

■ Defendants first argue that the Court should revisit its extensive analysis of preemption and find that *Galliano v. United States Postal Service,* 836 F.2d 1362 (D.C.Cir.1988), compels dismissal of Counts 1–14 of the Superseding Indictment as preempted by FECA. The Court is not inclined to revisit that analysis, espe-

cially in light of the in-depth consideration previously given to the issue. *See United States v. Hsia,* 24 F.Supp.2d at 38–45.

In the alternative, defendants contend that Counts 1, 5 and 9 are preempted by FECA, because Counts 5 and 9 are based entirely on soft money and Count 1 is based largely on allegations related to soft money. Defendants argue that even if FECA does not preempt the general federal criminal code in all instances, it does preempt the general federal criminal code when the conduct charged in the indictment is not proscribed by FECA. Because conduit donations and foreign donations are not proscribed under FECA, defendants argue that those counts based entirely or primarily on conduct related to soft money donations are preempted by FECA.

To the extent that defendants seek dismissal of Counts 5 and 9, the two counts premised entirely on soft money donations, their argument is rendered moot by the Court's ruling that those two counts must be dismissed against both defendants for other reasons. *See supra* at 5–6, 8. To the extent that defendants argue that FECA preempts the application of 18 U.S.C. § 371 to the conduct alleged in Count 1, they are incorrect. While much of the conduct at issue in Count 1 relates to soft money, Count 1 contains significant allegations with respect to hard money as well. Defendants certainly are correct that including allegations of overt acts related to soft money donations ratchets up the amount of money at issue; defendants estimate that approximately 88% of the money that is the subject of allegations in Count 1 is soft money. *See* Defs' Mot. No. 3 at 2. Nonetheless, of the money that is the subject of allegations in Count 1, close to $80,000, a not insignificant amount, relates to hard money contributions. At trial, of course, the government will have the burden of proving beyond a reasonable doubt "that the illegal 'contributions' alleged in the Superseding Indictment in fact are contributions as defined by FECA, and the jury will be so instructed." *United States v. Trie,* 23 F.Supp.2d at 61. But in view of the fact that Count 1 of the Superseding Indictment alleges conduct related to hard money contributions, defendants' preemption argument is unavailing and their motion therefore will be denied.

An Order consistent with this Opinion shall be issued this same day.

SO ORDERED.

### ORDER

For the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that the remainder of defendants' Motion No. 1 is GRANTED insofar as it seeks dismissal of Counts 5 and 6 against Ms. Kanchanalak and insofar as it seeks dismissal of Count 5 against Ms. Kronenberg and DENIED insofar as it seeks dismissal of Count 6 against Ms. Kronenberg; it is

FURTHER ORDERED that the government's motion for partial reconsideration of the Court's Order of December 31, 1998 is DENIED; it is

FURTHER ORDERED that Counts 5 and 6 of the Superseding Indictment are DISMISSED against Ms. Kanchanalak; it is

FURTHER ORDERED that Count 5 of the Superseding Indictment is DISMISSED against Ms. Kronenberg; it is

FURTHER ORDERED that defendants' Motion No. 2, to Dismiss Count 1, or, in the Alternative, to Strike Prejudicial Surplusage is DENIED; and it is

FURTHER ORDERED that defendants' Motion No. 3, to Dismiss Counts 1–14 on grounds of preemption, is DENIED.

SO ORDERED.