Lenora B. FULANI For President Committee and Lenora B. Fulani, Petitioners,

v.

FEDERAL ELECTION COMMISSION, Respondent.

No. 97–1466.

United States Court of Appeals, District of Columbia Circuit.

Argued April 21, 1998.

Decided June 23, 1998.

Arthur R. Block, Washington, DC, argued the cause and filed the briefs for petitioners.

Richard B. Bader, Associate General Counsel, Federal Election Commission, argued the cause for respondent, with whom Lawrence M. Noble, General Counsel, and Vivien Clair, Attorney, Washington, DC, were on the brief.

Before: SILBERMAN, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Lenora B. Fulani and Fulani for President Committee (collectively, Fulani) seek review of the Federal Election Commission's deter-

mination that they must repay approximately $120,000 in matching payments to the United States Treasury. We deny the petition.

## I.

Fulani sought the 1992 presidential nomination of the Democratic party, the New Alliance party, and several other independent parties. She received approximately $2,000,-000 from the United States Treasury pursuant to the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–9042 (1994). Eligible candidates are entitled to receive payments matching individual contributions up to $250, subject to a ceiling, but they may use matching funds only for "qualified campaign expenses." *See id.* §§ 9034, 9042(b); *see generally Simon v. FEC,* 53 F.3d 356 (D.C.Cir.1995); *Robertson v. FEC,* 45 F.3d 486 (D.C.Cir.1995).

The Act directs the FEC to audit each matching funds recipient and the Commission has established detailed examination procedures by regulation. *See* 11 C.F.R. pt. 9038 (1992).[1] Fieldwork—an inspection of the candidate's books and records—is the first step in that process. After the FEC completed its fieldwork with respect to Fulani's campaign records, it prepared and approved an interim audit report. The Commission's preliminary calculations contained therein indicated Fulani owed $1,394. Cash contributions to a candidate are not eligible to be matched with federal funds, and Fulani had purchased money orders, which may be matched, to be exchanged for cash from contributors who did not have checks. But she could not account for some of these money orders. Fulani promptly repaid the $1,394. The Commission approved a final audit report containing an "initial repayment determination," *see id.* § 9038.1(d)-(e), equal to the already repaid dollar amount a few months later. If a candidate chooses to contest the FEC's initial repayment determination, she is provided the opportunity to submit written materials (and may also request oral hearing) for the Commission to consider before it issues a "final repayment determination"; the initial determination otherwise becomes final 30 days after the candidate is served with written notice. *See id.* § 9038.2(c). Fulani—having already repaid the amount in question—did not contest.

The Commission, however, decided to hold its final determination in abeyance. It received information from a former Fulani campaign worker that called into question the accuracy of the documentation that it reviewed during the fieldwork phase of its audit. The Commission began an investigation pursuant to part 9039 of its regulations, which authorizes inquiries on the basis of information received from outside sources, then issued subpoenas and ordered depositions of campaign staff and vendors. But Fulani and some of the vendors she had used either complied incompletely or resisted—Fulani's campaign manager and the Committee's treasurer even asserted the Fifth Amendment privilege against self-incrimination. The Commission was forced to seek judicial enforcement of its subpoenas, which it obtained from the district court in the Southern District of New York on several occasions. On August 3, 1995, before some of those subpoenas were enforced, the FEC issued a second initial repayment determination, this time in the amount of $612,557.32. Fulani contested, and in its final repayment determination, the FEC reduced the amount that she owed to $117,269.54—$18,767.99 in non-qualified disbursements to the *National Alliance;* $73,750.55 in unsubstantiated payments to individuals by check; $1,394 in lost money orders (carried over from the prior repayment determination), and $22,357 in excess matching funds.[2] Fulani sought rehearing, which the Commission denied. Her petition for review of the Commission's order followed.

## II.

Fulani raises three challenges to the Commission's authority to have issued the second repayment determination and alternatively

---

1. We refer throughout to the regulations in effect at the time of Fulani's campaign.

2. Although Fulani does not specifically contest the Commission's excess matching funds determination ($22,357), it is entirely dependent on the contested disqualified expense findings.

argues the Commission's findings that she owes $18,767.99 in non-qualified disbursements to vendors and $73,750.55 in. unsubstantiated payments to individuals by check are unreasonable. ·We consider petitioner's challenges to the Commission's authority first.

■ The Matching Payment Act requires that "the Commission shall conduct a thorough examination and audit of the qualified campaign expenses of every candidate and his authorized committees who received pay-, ments." 26 U.S.C. § 9038(a) (1994). The FEC is instructed to determine whether matching payments to a candidate exceeded her entitlement, or if the candidate used matching funds to defray non-qualified campaign expenses, and must notify the candidate of a repayment obligation no later "than 3 years after the end of [the matching payment] period." *Id.* § 9038(c). Fulani claims that the Act contemplates only one repayment determination and therefore the Commission had no authority to take a second bite of the apple. The Commission's regulation, which . allows it to "mak[e] additional repayment determinations ... after it has made a final determination ... where there exist facts not used as the basis for a previous final determination," *see* 11 C.F.R. § 9038.2(f), is therefore *ultra vires.*[3] We agree with the Commission, however, that the statute is silent on the point and its regulation represents a permissible construction under *Chevron.*[4]

Petitioner next argues that the FEC had no authority to hold in abeyance its first repayment determination because, by operation of its own regulations, the determination became final when Fulani did not object to the FEC's first initial repayment determination within 30 days from the time she was served with written notice. *See* 11 C.F.R. § 9038.2(c)(1). We are puzzled as to why the Commission declared that it was staying the first repayment determination when, as discussed above, its own regulation explicitly

authorizes it to make additional repayment determinations on the basis of new facts. It is clear that the Commission treated its first repayment determination—which Fulani had already settled—as final during its second investigation. It did not reexamine the facts relating to the lost money orders, and devoted only one summary paragraph to the matter in its 90–page statement setting forth the legal and factual basis for its second final repayment determination. The Commission used the new information it had received only to investigate other of Fulani's expenses. Under these circumstances, we agree with the Commission's counsel that it makes no difference whether the first repayment determination is viewed as having been suspended until the second initial determination issued on August 3, 1995, or as becoming final prior to the supplementary determination.

■ Finally, petitioner argues that even if the Commission is entitled to make a second repayment determination, it was not issued within the three-year period as the statute requires. The parties agree that the Commission had until August 20, 1995 to notify Fulani of any repayment determination. Fulani claims, however, that the August 3 repayment determination, which imposed on Fulani an obligation to repay monies to the United States Treasury, was not the product of a "thorough examination and audit," and should be regarded as bogus—a figure drawn up just to meet the deadline. To be sure, the initial figure considerably exceeded the final determination. We can certainly imagine circumstances in which it might be successfully argued that the Commission's initial determination figure is not legitimate, but that is not this case. In light of the difficulties the Commission encountered in investigating Fulani's expenses, it cannot be blamed for drawing all inferences against Fulani. When a candidate seeks to frustrate and delay a government investigation, it can

---

**3.** The Commission, as we noted, initiated the supplementary audit pursuant to § 9039, which deals with its general investigation authority, but that regulation specifically allows it to make a § 9038 determination on the basis of the information obtained—which it did.

**4.** *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

hardly be heard to complain that the product is insufficiently thorough.

## III.

■ We turn, then, to petitioner's challenges to the disallowed expenses. Fulani argues that the Commission unreasonably concluded that her payments to the *National Alliance* weekly newspaper were non-qualified expenses. The Commission's initial repayment determination charged that the entire $75,062.50 Fulani had paid to the *National Alliance* failed to qualify. Fulani's only explanation was that those payments represented newspaper purchases, but the former campaign worker who had brought the new evidence to the Commission's attention testified that the newspaper was given to the public for free. The Commission ruled that Fulani therefore had not carried her burden of proving that her disbursements were qualified campaign expenses. *See* 11 C.F.R. § 9033.11(a). Fulani contested, and this time submitted an affidavit of a person familiar with the business of the *National Alliance.* He indicated that the paper sold for 50 cents, according to the masthead, and that Fulani purchased at the bulk rate of 35 cents a copy. The FEC accepted Fulani's bulk purchase rationale, but noted that according to the masthead, the bulk rate was actually only 15 cents per copy, so Fulani had overpaid by 20 cents per paper. The Commission determined that $31,500 (the number of copies purchased at a 15 cent rate) was a qualified campaign expense, but the remainder of the $75,062.50 was not. After calculating the pro rata share of the remainder (candidates must repay only the portion of an expenditure attributable to public funds), the Commission determined that Fulani had to repay $18,767.99.

Fulani sought reconsideration, offering as an explanation that the extra 20 cents represented a premium payment for extra coverage and printing costs—as the Commission describes it, a special services contract theory. But the Commission's rules provide that those seeking reconsideration must "[s]et

forth clear and convincing grounds why [new] questions [of fact or law] were not and could not have been presented during the earlier determination process." 11 C.F.R. § 9038.5(a)(1)(iii). Relying on its rule, the FEC refused to consider Fulani's new argument, because she had not shown any reason why this explanation could not have been provided earlier. The Commission is certainly entitled to prescribe its own procedures, including the requirement that candidates raise all arguments is support of their case before the Commission issues its final repayment determination. Fulani nevertheless argues that in this case the Commission acted unreasonably in not allowing her an exception to its rules. She purports to have relied on a memorandum from the FEC's General Counsel to the Commission (dated January 9, 1996) in preparation for oral hearing on her challenge to the initial repayment determination (held February 7, 1996), also produced to Fulani and the public, that indicated her *National Alliance* payments were qualified expenditures. The Commission legitimately pointed out, in denying rehearing, however, that staff memoranda do not set forth the Commission's position. And reliance on the General Counsel's memorandum is a particularly poor excuse here, as the memorandum directly contradicts the FEC's initial repayment determination. Moreover, even if the memorandum would have justified Fulani not having raised her new argument at oral hearing, it was written *after* she had submitted her arguments and evidence (October 9, 1995), which indisputably did not advance the "special services contract" theory.[5] Fulani's alternative claim, that she was simply responding to the FEC's shift in rationale between its initial repayment and final repayment determinations is also unpersuasive because the Commission only shifted theories in response to her bulk purchase explanation, in a way that was favorable to her. Fulani was aware that her payments to the *National Alliance* were at issue, and should have offered all of her explanations at the appropriate time.

5. We have previously upheld the FEC's regulation, 11 C.F.R. § 9038.2(c)(3), that limits oral hearings to matters raised in timely written sub-missions. *See Robertson,* 45 F.3d at 491. Fulani therefore may have been barred from raising the new theory at oral hearing in any event.

■ Fulani's second substantive objection is directed at the Commission's determination that payments by check from Fulani to individuals were unqualified expenditures because they were unsubstantiated. She claims that the Commission acted contrary to its own regulations which, properly interpreted, do not require Fulani to show—as the Commission demanded—a payee's personal endorsement. The checks endorsed by Fulani's staff, she argues, satisfied the Commission's own standards. Committee members either signed for the nominal payee along with their own name, or signed their own name with the notation "ok to cash." The FEC's documentation regulation sets forth four alternative methods for a candidate to substantiate disbursements in excess of $200. A receipted bill from the payee stating the purpose of the disbursement is preferred, *id.* § 9033.11(b)(i), but if that is not possible, the candidate may produce a "canceled check negotiated by the payee" and accompanying documentation generated by the payee. *Id.* § 9033.11(b)(ii). If the candidate cannot produce independent documentation generated by the payee that states the purpose of the disbursement, a "canceled check negotiated by the payee that states the purpose of the disbursement" will suffice. *Id.* § 9033.11(b)(iii). Otherwise, the candidate may "present a canceled check and collateral evidence to document the qualified campaign expense." *Id.* § 9033.11(b)(iv). It is on this last alternative that Fulani principally relies.

The Commission, however, interpreted subsection (b)(iv) of its regulation to require that the canceled check be negotiated *by the payee*, just as subsections (b)(ii) and (iii) require (in 1995, it amended the regulation to require this explicitly). Responding to Fulani's textual argument, the Commission said:

> [we] always expect[ ] that a canceled check will be negotiated by the payee. Simply because the Commission ɪin one instance did not include the phrase 'negotiated by the payee' when discussing canceled checks, should not be interpreted to mean that the Commission would accept a check endorsed by another as proof that the original payee received the funds.

The FEC's reading of its regulation admittedly is not obvious. The Commission's interpretation—that "canceled check" as used in subsection (b)(iv) means the same thing as "canceled check negotiated by the payee," used in the prior two subsections of the documentation regulation—is seemingly inconsistent with the *expressio unius est exclusio alterius* construction canon, that is, "the mention of one thing implies the exclusion of another." We have cautioned recently that the "maxim's force in particular situations depends entirely on context." *Shook v. District of Columbia Fin. Responsibility and Management Assistance Auth.*, 132 F.3d 775, 782 (D.C.Cir.1998).

■ The Commission explained that it interpreted its regulation as it did because there is otherwise no evidence that the money reached its intended source, and it cannot even conclude that a campaign expense was actually incurred. The other three parts of the Commission's documentation regulation each require that the candidate show receipt by the payee. In addition, each requires collateral evidence showing the purpose of the disbursement—even when a check is personally endorsed by a payee, the regulation requires either accompanying documentation generated by the payee, or that the canceled check state the purpose of the disbursement. What varies among the steps is the form that the evidence of receipt and purpose take. In that context, it is not clear that by omitting the words in question, the Commission meant to entirely dispense with the requirement that there be at least some evidence of receipt by the payee—or to weaken the evidentiary standard so far as to allow the candidate to self-document her own disbursements. If we were interpreting this language *de novo* it would be one thing. But the FEC is, of course, entitled to substantial deference when it interprets its own regulations, *see Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986), and we think it reasonable—given that the regulation as a whole is concerned with both ensuring that a payment actually was disbursed and that it was used for an appropriate purpose—for the Commission to interpret its regulation to require a personal endorsement on the canceled check, even

though the fourth subpart did not include the precise words "negotiated by the payee." [6]

\* \* \* \*

Fulani raises several other claims, including that the section 9039 investigation was a "prosecutorial audit" that violated Fulani's due process and that the FEC was required to accept the definition of "negotiated" under New York commercial law in construing its documentation regulation, that we have not addressed, but have nevertheless considered and reject. The petition is denied.

---

**6.** Even if petitioner's interpretation of the regulation were correct, the fourth subpart also requires the candidate to present "collateral evidence" to document the expense. The Commission never explicitly said that Fulani had failed to carry this burden, but it did point out that she only submitted affidavits (and no documentation) to show that the funds reached their intended recipients although her Committee treasurer cashed the checks by the double endorsement method. In the FEC's view, her "after-the-fact affidavit testimony [was] not sufficient to trace the flow of the cash from the [candidate] to the [payees]." And, according to the Commission, Fulani did not even submit affidavits to explain who received payment on some of the disqualified checks. While we cannot affirm the Commission on a rationale that it did not advance, it is worth noting that it had an alternate ground for its decision.