United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 8, 1999 Decided October 8, 1999 

 No. 99-3019

 United States of America, 
 Appellant

 v.

 Pornpimol Kanchanalak a/k/a Pornpimol Parichattkal, and 
 Duangnet Georgie Kronenberg, 
 Appellees

 Consolidated with 
 No. 99-3034

 Appeals from the United States District Court 
 for the District of Columbia 
 (No. 98cr00241)

 Jonathan Biran, Attorney, United States Department of 
Justice, argued the cause and was on the briefs for appellant. 
Eric L. Yaffe, Attorney, entered an appearance.

 Reid H. Weingarten argued the cause for appellees. With 
him on the brief were Erik L. Kitchen, Brian M. Heberlig, 
and James Hamilton. Michael Spafford entered an appear-
ance.

 Before: Wald, Silberman and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Wald.

 Wald, Circuit Judge: The government charged Pornpimol 
"Pauline" Kanchanalak (aka Pornpimol Parichattkal) and 
Duangnet "Georgie" Kronenberg with a scheme to disguise 
illegal hard money contributions and soft money donations 
from foreign nationals and corporations to national and state 
political committees. Defendants were also alleged to have 
caused political committees to file reports with the Federal 
Election Commission ("FEC") falsely identifying lawful per-
manent residents as the source of funds that actually originat-
ed with foreign nationals and corporations in violation of 18 
U.S.C. ss 2 (b), 1001. The government argued that s 441e of 
the Federal Election Campaign Act ("FECA") prohibits any 
infusion of money from foreign nationals into federal, state, 
and local elections and that section 104.8 of the FEC 
regulations requires that political committees report the true 
source of their contributions and donations. Defendants as-
serted that as to both hard and soft money, political commit-
tees were not required to report the true sources of their 
receipts, and as to soft money, FECA did not restrict such 
donations by foreign nationals.1 They also argued that the 

__________
 1 Defendants now concede that in United States v. Hsia, 176 F.3d 
517 (D.C. Cir. 1999), we rejected their contention that political 
committees are not required to report the true sources of their hard 
money but ask us to reconsider that decision. We have no authori-
ty to do so. See LaShawn v. Barry, 87 F.3d 1389, 1396 (D.C. Cir. 
1996) ("One three-judge panel ... does not have the authority to 
overrule another three-judge panel of the court.... That power 
may be exercised only by the full court.").

FEC reporting regulation could not reasonably be read to 
require disclosures of the original sources of soft money 
receipts.

 Based on its prior rulings in United States v. Hsia and 
United States v. Trie, the district court dismissed the hard 
money counts, determining that the government needed to 
demonstrate affirmative conduct beyond using conduit checks 
for a false statement prosecution. See United States v. Hsia, 
24 F. Supp. 2d 33 (D.D.C. 1998), rev'd, 176 F.3d 517, 523-24 
(D.C. Cir. 1999); United States v. Trie, 23 F. Supp. 2d 55 
(D.D.C. 1998). The district court also dismissed the soft 
money counts, holding that the disclosure regulation, section 
104.8(e), did not require political committees to reveal the 
original sources of their soft money.

 This court subsequently reversed the district court's ruling 
in Hsia, finding that, in fact, the government had sufficiently 
alleged affirmative conduct for a false statement prosecution 
by charging that the defendant utilized conduit checks, and 
that FECA requires the "true source" of hard money to be 
reported. See United States v. Hsia, 176 F.3d 517 (D.C. Cir. 
1999). On the basis of that ruling, the government seeks 
reinstatement of the hard money counts in this case. We 
agree that our decision in Hsia mandates reinstatement of 
the hard money false statement counts, and thus we summari-
ly reverse the district court's order with respect to those 
counts.

 We also find that the FEC regulation, section 104.8(e), 
prohibits the reporting of conduit contributions with respect 
to soft money and that s 441e of FECA also prohibits foreign 
soft money donations. Accordingly, we reverse the judgment 
of the district court with respect to the soft money counts as 
well.

 I. Background

 Defendants, Pauline Kanchanalak and Duangnet Kronen-
berg, were charged with "knowingly and willfully caus[ing] 
the submission of material false statements to the FEC." See 
Superceding Indictment, at 24. Defendants are officers of 
Ban Chang International (USA) Inc. ("BCI USA"), a foreign 

corporation. Kanchanalak is neither a citizen nor a perma-
nent resident of the United States. Kronenberg is a perma-
nent resident of the United States. The contributions in 
question are checks made out to political committees and 
signed by permanent residents of the United States, even 
though the signing individuals were not the actual source of 
the donated funds.

 On November 13, 1998, a federal grand jury issued an eighteen-
count superceding indictment against defendants. The indict-
ment charged violations of FECA, 2 U.S.C. ss 431 et seq., 
and regulations issued by the FEC pursuant to FECA. The 
indictment generally alleges a scheme in which defendants 
illegally provided both "hard money contributions" and "soft 
money donations" to the Democratic National Committee 
("DNC" or "the Committee") and other political committees.2 
"Hard money" refers to funds that have been deposited by 
the Committee into a "federal account" and are used to 
finance federal election campaigns. "Soft money" refers to 
funds that are deposited into a "non-federal" account and are 
supposed to be used for, among other things, state and local 
campaigns. See Trie, 23 F. Supp. 2d at 55. Defendants are 
alleged to have illegally used conduits to donate to the 
Committee both hard and soft money funds that originated 
with foreign nationals and corporations. The conduits were 

__________
 2 A "political committee" is defined under FECA as follows:

 (A) any committee, club, association, or other group of per-
 sons which receives contributions aggregating in excess of 
 $1,000 during a calendar year or which makes expenditures 
 aggregating in excess of $1,000 during a calendar year; or
 
 ...
 
 (C)any local committee of a political party which receives 
 contributions aggregating in excess of $5,000 during a calendar 
 year, or makes payments exempted from the definition of 
 contribution or expenditure ... in excess of $5,000 during a 
 calendar year, or makes contributions aggregating in excess of 
 $1,000 during a calendar year or makes expenditures aggregat-
 ing in excess of $1,000 during a calendar year.
 
2 U.S.C. s 431(4).

Duangnet Kronenberg and Praitun Kanchanalak, a relative of 
both defendants and an unindicted co-conspirator.3

 More specifically, Count One charges that defendants en-
gaged in a conspiracy to defraud the United States by 
disguising the fact that the true source of funds contributed 
to the DNC was BCI USA. See Appendix ("App.") 60-82; 
Superceding Indictment p p 1-66. Counts Two through Four-
teen charge that defendants knowingly and willfully caused 
the DNC and other political committees to file false reports 
with the FEC, which erroneously identified the sources of 
contributions and donations, in violation of 18 U.S.C. ss 2(b), 
1001.4 See App. 83-85, Superceding Indictment p p 1-2. The 
false statements were contained in thirteen reports filed with 
the FEC; each report is the subject of a separate count.

 Counts Two through Four, Six through Eight and Thirteen 
of the superceding indictment were based solely on hard 
money "contributions."5 The remaining false statement 
__________
 3 The indictment alleges that the defendants caused political 
committees to receive checks signed "P. Kanchanalak," leading 
political committees to believe that they were being made by 
Pauline Kanchanalak, even as they were being drawn on Praitun 
Kanchanalak's account. See Appendix at 67.

 4 Section 1001 currently provides, in relevant part, that:
 (a) Whoever, in any matter within the jurisdiction of the 
 executive, legislative, or judicial branch of the Government of 
 the United States, knowingly and willfully ... makes any 
 materially false, fictitious, or fraudulent statement or represen-
 tation ... shall be fined under this title or imprisoned not more 
 than 5 years, or both.
 
18 U.S.C. s 1001. Some counts allege violations of the previous 
version of s 1001. However, the differences between these ver-
sions are not relevant to the appeal.

 Section 2(b) provides: "Whoever willfully causes an act to be 
done which if directly performed by him or another would be an 
offense against the United States, is punishable as a principal." 18 
U.S.C. s 2(b).

 5 A contribution is defined under FECA's definitional provision as 
"any gift, subscription, loan, advance, or deposit of money or 

counts were based either partly or wholly on soft money 
funds that were not deposited into a federal account. Defen-
dants sought dismissal of both the hard and soft money 
counts, arguing that under 18 U.S.C. ss 2(b), 1001, the gov-
ernment had failed to demonstrate adequately that defen-
dants "caused" the submission of false statements. Addition-
ally, on the soft money counts, defendants argued that soft 
money conduit contributions--even from foreign nationals--
were not prohibited under FECA.

 On December 31, 1998, the district court, largely agreeing 
with the defendants, dismissed Counts Two through Four and 
Seven through Fourteen. See United States v. Kanchanalak, 
31 F. Supp. 2d 13, 14 (D.D.C. 1999) ("Kanchanalak I"). The 
district court's decision was based on its own prior reasoning 
in United States v. Hsia, 24 F. Supp. 2d at 33, and Trie, 23 
F. Supp. 2d at 55. In both Hsia and Trie, the government 
had alleged only that the defendants signed conduit checks, 
or solicited others to act as signers for conduit checks. The 
court found that merely signing (or soliciting others to sign) 
checks was not sufficient to demonstrate that the defendants 
had "caused" the making of false statements about the actual 
source of the contributions.6 In Hsia, it also found that the 
"statements" at issue were literally true, since the check 
writers were a source (if not the only source) of the contribut-
ed funds. In Kanchanalak I, the court found that the 

__________
anything of value made by any person for the purpose of influencing 
any election for Federal office." 2 U.S.C. s 431(8)(A)(i).

 6 In Hsia and Trie, the district court said that the indictment's 
lack of specificity in this regard was constitutionally impermissible, 
given that it charged conduct in an area which implicated First 
Amendment considerations. The court found that "[t]he combina-
tion of First Amendment interests at stake and the threat of a 
criminal prosecution necessitates a close examination of any indict-
ment to ensure that the statutes utilized are neither overly vague 
nor overly broad in their language or in their application." Hsia, 
24 F. Supp. 2d at 56. This court later rejected this vagueness 
argument, holding that the application of the statute to the conduit 
check situation was not so broad so as to offend the First Amend-
ment. See Hsia, 176 F.3d at 523.

allegations were "virtually indistinguishable from the allega-
tions at issue in Hsia and Trie." Kanchanalak I, 31 F. Supp. 
2d at 14. Again, the government had failed to allege any 
conduct that could satisfy the necessary causal elements of a 
violation under 18 U.S.C. ss 2(b), 1001. In Kanchanalak I, 
the district court did not reach the issue of whether there was 
a basis--statutory or otherwise--for the government to allege 
false statements at all with respect to soft money.7

 On February 3, 1999, in United States v. Kanchanalak, 41 
F. Supp. 2d 1 (D.D.C. 1999) ("Kanchanalak II"), the district 
court dismissed all of the remaining false statement counts as 
to Ms. Kanchanalak and all but one as to Ms. Kronenberg. 
Even as to those counts for which the government had 
sufficiently met its burden of alleging "affirmative conduct," 
the district court found that there was an additional reason 
supporting dismissal, namely, the inapplicability of FECA to 
soft money.

 The court found only one provision in FECA that arguably 
provided a basis for alleging a false statement, namely s 441f, 
which prohibits contributions in another person's name, and 
that indisputably applied only to hard money.8 In the court's 
words, "[o]n the thin reed of Section 441f, the government 
... has a plausible argument that a report submitted by a 
political committee to the FEC that lists the identity of a 
'conduit' or a person other than the true source of a contribu-
tion contains a false statement." Kanchanalak II, 41 

__________
 7 In Kanchanalak I, the district court declined to dismiss some 
disputed counts, ordering the parties to file supplemental briefs 
indicating whether these remaining counts might survive Hsia. See 
Kanchanalak I, 31 F. Supp. 2d at 15.

 8 Section 441f, entitled "[c]ontributions in name of another prohib-
ited," provides that:

 No person shall make a contribution in the name of another 
 person or knowingly permit his name to be used to effect such 
 a contribution, and no person shall knowingly accept a contri-
 bution made by one person in the name of another person.
 
2 U.S.C. s 441f.

F. Supp. 2d at 7 (internal quotations omitted). However, that 
argument "relied heavily on the definitions and operation of 
FECA, definitions that apply only to hard money 'contribu-
tions' regulated by FECA." Id. Although FECA requires 
political committees to report their hard money contributions, 
the court could find no corresponding FECA provision requir-
ing political committees to report soft money donations. Id. 
(discussing 2 U.S.C. s 434 (b)(2)(A)).

 The only reporting requirement directly applicable to soft 
money donations was 11 C.F.R. s 104.8(e), which the court 
characterized as a "stand alone provision in the regulations." 
Id. at 8. However, that provision in "the regulations provid-
ed no indication of whether a national party committee is 
obligated to report the 'true source' of any such donation"; 
thus the court said that the government "lacks any basis to 
argue that the statute and regulations require a political 
committee to list the names of 'true sources' of soft money 
donations in reports to the FEC." Id. Since neither FECA 
nor FEC regulations required committee treasurers to report 
the "true sources" of soft money donations, the court rea-
soned, defendants had not "caused" political committees to 
issue "false statements," and, therefore, had not violated 18 
U.S.C. ss 2(b), 1001.

 After the district court ruled in Kanchanalak I and II, this 
court reversed in large part the district court's decision in 
Hsia. See Hsia, 176 F.3d at 517. In Hsia, we rejected the 
district court's ruling that knowingly engaging in conduit 
check writing was not enough to "cause" a false statement to 
be made. Id. at 522-23. We found that s 434(b) of FECA 
requires political committees to report the "true source" of 
hard money contributions; thus, statements identifying con-
duits as the source of funds were not "literally true." Id. at 
523-24.

 The government now appeals the dismissal of the hard 
money counts in Kanchanalak II on the grounds that its 
reasoning was explicitly rejected in our Hsia decision. The 
government also seeks reinstatement of the soft money 
counts on the theory that the FEC reporting regulation, 

section 104.8(e), requires political committees to report the 
same information for soft money that they report for hard 
money, including the true sources of their receipts.

 II. Discussion

A. Hard Money Counts

 Our reasoning in United States v. Hsia, 176 F.3d 517 (D.C. 
Cir. 1999), mandates reinstatement of the hard money counts 
in this case. In Hsia we found that "the simple interposition 
of conduits to sign the checks is certainly enough to 'cause' a 
committee to make false statements in its report." Id. at 523. 
We also held that FECA requires political committees to 
identify the true source of hard money contributions. There-
fore, if committees "did not report the true sources, their 
statements would appear to be false." Id. at 524.

 In these respects, this case is indistinguishable from Hsia. 
As in Hsia, defendants are alleged to have acted as conduits 
or utilized others as conduits in making contributions to 
political committees in federal elections. By thus causing 
political committees to report conduits instead of the true 
sources of donations, defendants have caused false statements 
to be made to a government agency. Accordingly, we sum-
marily reverse the district court's orders dismissing the false 
statement counts predicated on hard money contributions.

B. Soft Money Counts

 1. The Soft Money Reporting Regulation
 
 The validity of the false statement prosecutions based on 
conduit soft money donations ultimately turns on whether the 
FEC's soft money regulation, 11 C.F.R. s 104.8(e), is read to 
require political committees to report the "true" sources of 
their soft money donations. As the district court correctly 
noted, there is no soft money counterpart to s 441f in FECA 
itself, which prohibits conduit transfers of "contributions," 
i.e., hard money. We note at the outset, however, that 
defendants do not attack the FEC's authority under the Act 
to promulgate regulations that address the disclosure of soft 

money donations.9 However, defendants do contest the 
FEC's interpretation of section 104.8(e) as a valid basis for a 
false statements prosecution.

 We first discuss the standard under which we review the 
FEC's interpretation of its soft money disclosure regulation, 
keeping well in mind that this interpretation must also satisfy 
due process notice requirements of a criminal conviction for 
false statements. In Paralyzed Veterans of America v. D.C. 
Arena, L.P., 117 F.3d 579, 584 (D.C. Cir. 1997) (citations 
omitted), we said:

 Agency interpretations of their own regulations have 
 been afforded deference by federal reviewing courts for a 
 very long time and are sustained unless "plainly errone-
 ous or inconsistent" with the regulation. It is sometimes 
 said that this deference is even greater than that granted 
 an agency interpretation of a statute it is entrusted to 
 administer.
 
We have followed that standard in FEC cases, explaining:

 The Supreme Court, we note, explicitly concluded in 
 DSSC [FEC v. Democratic Senatorial Campaign Com-
 mittee] "that the [Federal Election] Commission is pre-
 cisely the type of agency to which deference should 
 presumptively be afforded."
 
John Glenn Presidential Comm., Inc. v. FEC, 822 F.2d 1096, 
1097 (D.C. Cir. 1987) (citing FEC v. Democratic Senatorial 
Campaign Comm., 454 U.S. 27, 37 (1981)); see also Fulani v. 
FEC, 147 F.3d 924 (D.C. Cir. 1998) (FEC entitled to "sub-
stantial deference" when interpreting own regulation). Quite 
apart from the substantial deference that we owe the agency, 
we find it eminently reasonable for the FEC to interpret 
section 104.8(e) to require political committees to report the 
true source of their soft money donations.

__________
 9 FECA explicitly grants the FEC broad powers to administer its 
duties under the Act. See, e.g., 2 U.S.C. s 437c(b)(1) (granting 
FECA the authority to formulate general policy with respect to the 
administration of FECA); accord 2 U.S.C. ss 437d(a)(8), 437d(e) & 
437g(a).

 We begin with the language of the provision itself. See 
Pennsylvania Dep't of Pub. Welfare v. Davenport, 495 U.S. 
552, 557-58 (1990). Section 104.8(e) provides, in relevant 
part, that:

 National party committees shall disclose in a memo 
 Schedule A information about each individual, committee, 
 corporation, labor organization or other entity that do-
 nates an aggregate amount in excess of $200 in a calen-
 dar year to the committee's non-federal account(s). This 
 information shall include the donating individual's or 
 entity's name, mailing address, occupation, or type of 
 business, and the date of receipt and amount of any such 
 donation.... The memo entry shall also include, where 
 applicable, the information required by paragraphs (b) 
 through (d) of this section.
 
11 C.F.R. s 104.8(e).

 There can be no doubt, and indeed the district court acknowl-
edged, that section 104.8(e) imposes a reporting requirement 
with respect to soft money that includes the identity of the 
"donating individual[ ]," as well as, "where applicable," the 
information required for hard money sources in section 
104.8(b)-(d).10 The district court, however, focused on the 
fact that "donates" is nowhere defined in the regulation (or in 
FECA), and does not have an ordinary meaning that confined 

__________
 10 The district court deemed it a "stand alone provision in the 
regulations," not rooted in any particular provision within the 
FECA. Kanchanalak II, 41 F. Supp. 2d at 7. We are not sure 
why this is relevant. We also point out that in its effort to locate a 
statutory source for the prohibition against soft money conduit 
contributions, the district court discussed only 2 U.S.C. s 441f, the 
provision which prohibits hard money contributions in the name of 
another, and which it found was not applicable to soft money. See 
id. Notably, the district court opinion never addressed s 441e, 
which proscribes contributions from foreign nationals, as a potential 
source for the statutory prohibition on at least some soft money 
conduit contributions. One reason it may not have done so is that it 
had previously found in Trie that, contrary to the FEC's interpreta-
tion, s 441e is inapplicable to soft money.

it to the true source of the donated funds. In the district 
court's words:

 [T]he regulations provide no indication of whether a 
 national party committee is obligated to report the "true 
 source" of any such donation. In fact, the word "do-
 nates" is never defined in either the statute or regula-
 tions. The government therefore lacks any basis to 
 argue that the statute and regulations require a political 
 committee to list the names of "true sources" of soft 
 money donations in reports to the FEC.
 
Id.

 Defendants reiterate here the district court's reasoning, 
concluding that "an individual who writes a soft money dona-
tion check to a committee literally constitutes a 'donating 
individual' or an individual that 'donates' to the committee's 
non-federal account, even if that individual is in fact reim-
bursed for the donation." Br. of Appellees, at 11-12.

 That proposition does not seem so apparent to us. To 
donate ordinarily signifies the act of giving away something 
over which the giver has control or sovereignty. Thus a 
donation is defined, inter alia, as "a formal grant of sover-
eignty or dominion." Webster's Third New International 
Dictionary (Unabridged) 672 (1976). And indeed in Hsia, 
this court rejected a similarly restrictive definition of persons 
who "make the contribution" in the case of hard money, 
declaring that the "demand for identification of the 'person 
who makes the contribution' is not a demand for a report on 
the person in whose name money is given; it refers to the 
true source of money." Hsia, 176 F.3d at 524. We see no 
critical distinction between the ordinary meaning of the terms 
"contribute" and "donate" in that respect.11

 There is, however, an even more crucial sentence in section 
104.8(e) that validates the FEC's interpretation, namely, the 
requirement that "the memo entry shall also include, where 

__________
 11 We recognize that because of the special definition of contribu-
tion in the Act, s 441f prohibits conduit contributions of hard 
money only. But this limitation on the scope of s 441f does not 
upset the ordinarily synonymous meanings ascribed to both terms.

applicable, the information required by paragraphs (b) through 
(d) of this section." 11 C.F.R. s 104.8(e). Thus, subsection 
(e), by its own terms, cannot be read in isolation, but must be 
read to incorporate (unless inapplicable) the earlier hard 
money disclosure requirements of paragraphs (b) through (d). 
Among those provisions is subsection (c), which provides that: 
"[a]bsent evidence to the contrary, any contribution made by 
check, money order, or other written instrument shall be 
reported as a contribution by the last person signing the 
instrument." 11 C.F.R. s 104.8(c) (emphasis added).12 The 
incorporation of this disclosure provision into section 104.8(e) 
is significant. Its language is transparent; a committee may 
not report that a signer is the actual source of funds if it is 
aware that the signer is not the source.13 The plain implica-

__________
 12 The district court did refer to subsection (c) in addressing the 
hard money reporting requirements in Hsia, but limited its applica-
tion to committee treasurers. Hsia, 24 F. Supp. 2d at 59 (noting 
that the provision "implies that if there is 'evidence to the contrary' 
of which the political committee is aware, the committee may not 
report the contribution as having been made by the last person 
signing the instrument. The FEC regulation, if not the statute 
itself, therefore implies that the term 'contributor' is not synony-
mous with the phrase 'the last person signing the instrument' and 
that the political committee is supposed to identify the 'true source' 
of a contribution if it knows the true source."). The district court 
thus found that while 11 C.F.R.s 104.8 (c) may impose obligations 
on the committee treasurer, it does not impose the same obligation 
on a donor, absent a knowing conspiracy with the treasurer to 
conceal the true source.

 In Kanchanalak II, the district court acknowledged subsection 
(c) in a footnote, but failed to draw the connection we find between 
subsection (c) and subsection (e). See Kanchanalak II, 41 F. Supp. 
2d at 7 n.6.

 13 Our analysis in Hsia is relevant here again. If political com-
mittees did not report the true sources of their donations, their 
statements would appear to be false. Even if the defendants did 
not themselves make false statements to the FEC (and are not 
being charged as such), "the simple interposition of conduits to sign 

tion of this is that a signer, who through a knowing conduit 
transaction, causes a committee to make an erroneous identi-
fication by withholding "evidence to the contrary," may be 
held responsible for causing the false statement.

 Defendants offer one counter-argument. The term "contri-
bution" contained in 11 C.F.R. s 104.8(c) is defined as "any 
gift ... for the purpose of influencing any election to Federal 
office." 2 U.S.C. s 431(8)(A) (emphasis added). Since the 
term "contribution" in subsection (c) is thus limited to hard 
money used for federal elections, the entire subsection (c) by 
its own terms is similarly limited and hence not "applicable" 
to the soft money reporting requirements of section 104.8(e).

 A closer and more contextual reading of section 104.8 and 
its various subsections disposes of this argument. Subsec-
tions (b), (c), and (d) of section 104.8, all incorporated by 
reference into subsection (e), address requirements for "con-
tributions." On defendants' apocalyptic reasoning none 
would ever be applicable to subsection (e); this reading in 
turn would render the entire incorporation clause referring to 
subsections (b) through (d) superfluous. See Benavides v. 
DEA, 968 F.2d 1243, 1248 (D.C. Cir. 1992) (declining to 
interpret a provision so as to render it superfluous). Surely 
it is not reasonable to think that the FEC would have 
incorporated other subsections into subsection (e), when "ap-
plicable," if it knew or intended that none of these subsections 
could ever apply to soft money. The more reasonable inter-
pretation by far is that these hard money disclosure require-
ments apply to soft money reporting unless there is an 
obvious reason why they should not.14

__________
the checks is certainly enough to 'cause' a committee to make false 
statements in its report." Hsia, 176 F.3d at 523.

 14 It bears noting that the FEC has not been particularly consis-
tent when it has employed the term "contribution" in regulations 
and opinions. Indeed, the term is often used synonymously with 
"donation." See, e.g., 11 C.F.R s 113.3 (referring to "funds donated 
... to a candidate for federal office"); 11 C.F.R. s 115.2 (a) 
(prohibition on federal contractor "contributions" not applicable to 
"contributions ... in connection with State or local elections"); 

 Not only is the FEC's construction of section 104.8(e) 
reasonable, but it also advances the articulated concerns that 
impelled the FEC to adopt the regulation in the first place. 
See Methods of Allocation Between Federal and Non-Federal 
Accounts, 55 Fed. Reg. at 26,058.15 Adopted in 1990 as part 
of a "comprehensive set of allocation rules" drafted to "pro-
vide additional safeguards against the use of impermissible 
[soft money] funds in federal election activity by expanding 
the disclosure of receipts and disbursements by national 
party committees," section 104.8, in particular, was "[r]evised 
[to] ... require national party committees to disclose the 
source and amount of receipts by their non-federal accounts 
... as well as by their federal accounts under the current 
rules." The revised section was retitled "Uniform Reporting 
of Receipts," id., "to reflect its broadened application" to both 
hard and soft money. To that end, "[n]ew paragraph (e)," the 
FEC explained, "require[s] national party committees to also 
disclose information about receipts to their non-federal ac-
counts." Id. This "broadened disclosure" was designed to 
"help eliminate the perception that prohibited funds [soft 
money] have been used to benefit federal elections and cam-
paigns." Id.

 Given our druthers, we might have wished that the FEC 
elaborated in greater detail just why identifying the true 
source of soft money would prevent the reality or the percep-
tion of soft money being illicitly used for federal election 

__________
FEC Advisory Op. 1998-11 (Sept. 3, 1998), 1998 WL 600994, at *3 
(discussing "contributions in connection with State and local elec-
tions"); FEC Advisory Op. 1997-14 (Aug. 22, 1997), 1997 WL 
529606, at *2 (discussing "contributions" to "State party building 
funds") (emphasis added in all citations).

 15 In interpreting a regulation, we may consider a contemporane-
ous statement of the agency's policy reasons for promulgating it. 
See Sierra Pac. Power v. EPA, 647 F.2d 60, 65 (9th Cir. 1981) ("An 
appellate court will ordinarily give substantial deference to a con-
temporaneous agency interpretation of a statute it administers. 
When dealing with an interpretation of regulations the agency has 
itself promulgated, 'deference is even more clearly in order.' ") 
(quoting Udall v. Tallman, 380 U.S. 1, 16 (1965)).

purposes. We do know that the overall design of the new 
allocation and reporting requirements was "to track the flow 
of non-federal funds transferred into federal accounts" to 
insure they were used only for legitimate allocation of joint 
expenses. It does not seem to require any leap from that 
premise to the conclusion that tracking such a flow will often 
be easier if the true source of the soft money is identified. 
For instance, the identity of the real donor may suggest to 
the FEC monitor that special scrutiny is in order to insure 
the pristineness of the federal side of the ledger. Ultimately, 
however, we know of no bar to an agency's interpretation of a 
prophylactic disclosure rule, such as this one, that may over-
shoot the mark a bit, so long as it stays in reasonable range.16

 To cut to the chase, we find that the language and purpose 
of section 104.8(e) permits only one reasonable interpretation. 
In an effort to enhance its ability to prohibit the illegal 
commingling of hard and soft money receipts, the FEC 
required identifying information for the donors of both to 
assist it in tracking the flow of funds between the two.

 2. Fair Notice

 That the FEC's interpretation of its disclosure regulation 
as applying to the true source of soft money is a reasonable 
one does not end the matter. For to support a criminal 
prosecution, it must give fair notice to the subject of what 
conduct is forbidden. The Due Process Clause of the Fifth 
Amendment prohibits punishing a criminal defendant for 
conduct "which he could not reasonably understand to be 
proscribed." United States v. Harris, 347 U.S. 612, 614 
(1954). The Supreme Court has held that this "fair warning" 
requirement prohibits application of a criminal statute to a 
defendant unless it was reasonably clear at the time of the 

__________
 16 Defendants also counter that "no purpose would be served by 
requiring the reporting of the original source of soft money," given 
that "soft money donations in the name of another are not prohibit-
ed by FECA." Br. of Appellees, at 12, n.13. This ignores the 
FEC's longstanding interpretation of s 441e as barring foreign 
national contributions of soft money in section 110.4a.

alleged action that defendants' actions were criminal. United 
States v. Lanier, 520 U.S. 259, 266 (1997).

 The Superceding Indictment does not offend the principles 
of due process and fair notice because the defendants should 
reasonably have understood federal laws to require commit-
tees to report the true source of soft money donations. 
Additionally, they should reasonably have understood that 
disguising those true sources would cause false statements to 
be made in violation of 18 U.S.C. ss 2(b), 1001. The court in 
Hsia, which addressed the hard money reporting require-
ment, found that this "case fits comfortably within the clear 
and previously accepted scope of ss 2(b) and 1001." Hsia, 
176 F.3d at 523. We find likewise in this case. In arguing 
that ss 2(b), 1001 may not comfortably be applied to soft 
money reporting, defendants assert that it was previously 
unclear that section 104.8(e) required real source identifica-
tion for soft money, thus it would violate the due process 
requirement of clear notice to hold them criminally accounta-
ble now. We disagree.

 Section 104.8(e) explicitly covers soft money; the FEC has 
interpreted it as such since its promulgation and announced 
its prophylactic purpose at that time. It also expressly 
incorporated several hard money disclosure requirements laid 
down in earlier subsections (b) through (d) into the subsection 
(e) requirement. One of those, subsection (c), unambiguously 
permits committees to report the name of the signer of a 
check as the donor only if there is no "evidence to the 
contrary." If an individual possesses that contrary evidence 
and participates in the conduit transaction by signing the 
check himself or conspiring with another to do so, he is 
"causing" a false statement to be made to the FEC in 
violation of ss 2(b), 1001. That is clear notice enough.

 3. The Foreign National Prohibition

 The government offers a further justification for the soft 
money reporting requirement. It contends that s 441e of 
FECA bars foreign nationals from making both hard money 
contributions and soft money donations, indirectly or directly, 

for use in either federal or local elections. This statutory bar, 
it says, provides a powerful justification for the true source 
reporting requirement of soft money--that is, to ensure that 
United States citizens and permanent residents are not con-
duits for soft money that originates with foreign nationals. 
Defendants resolutely maintain that the statutory language of 
s 441e restricts that provision's scope to federal elections.

 In determining whether an agency's interpretation of a 
statute is appropriate, we apply Chevron U.S.A. Inc. v. Natu-
ral Resources Defense Council, Inc., 467 U.S. 837 (1984).17 
Under Chevron, the court examines whether the statute 
speaks "directly ... to the precise question at issue." Chev-
ron, 467 U.S. at 842-43. If the statute "has not directly 
addressed the precise question at issue," then the agency's 
construction, if reasonable, should be honored. Id.

 Through a promulgated regulation and an advisory opinion, 
the FEC has indicated that s 441e prohibits soft money 
donations as well as hard money contributions by foreign 
nationals. See, e.g., 11 C.F.R. s 110.4(a); FEC Advisory 
Opinion, 1987-25 (Sept 17. 1987), 1987 WL 61721. Section 
441e provides, in relevant part, that:

 It shall be unlawful for a foreign national directly or 
 through any other person to make any contribution of 
 money or other thing of value, or to promise expressly or 
 impliedly to make any such contribution, in connection 
 with an election to any political office; or in connection 
 with any primary election, convention, or caucus held to 
 select candidates for any political office; or for any 
 
__________
 17 Defendants argue that this court should not give Chevron 
deference to the FEC's interpretation of an ambiguous statute in a 
criminal proceeding. Defendants' support for this proposition is 
scant. That criminal liability is at issue does not alter the fact that 
reasonable interpretations of the act are entitled to deference. See 
Babbitt v. Sweet Home Chapter of Communities for a Great Or., 
515 U.S. 687, 703-05 (1995) (according Chevron deference to a 
Department of the Interior regulation which interpreted a criminal 
provision of the Endangered Species Act).

 person to solicit, accept, or receive any such contribution 
 from a foreign national.
 
2 U.S.C. s 441e.

 Although the text by itself might appear comprehensive 
enough to encompass soft money, the defendants point to the 
use of the word "contribution" in that section; contribution is 
defined elsewhere in the Act as applying to hard money for 
federal elections. The term "contribution," as we have noted, 
includes: "(i) any gift ... made by any person for the 
purpose of influencing any election for Federal office...." 2 
U.S.C. s 431(8)(A)(i).

 This definition, say defendants, limits the scope of s 441e 
to federal elections. Principles of consistent usage in statuto-
ry interpretation must, however, be applied consistently. 
While defendants focus exclusively on the term "contribu-
tion," they ignore the phrase "any political office" which 
appears not only in s 441e but also in its neighboring provi-
sion, s 441b. Section 441b distinguishes between contribu-
tions to federal offices and those tendered to "any political 
office."18 Thus while s 441b regulates the manner in which 
most corporations and labor organizations may contribute to 
__________
 18 Section 441b provides, in relevant part, that:

 (a) It is unlawful for any national bank, or any corporation 
 organized by authority of any law of Congress, to make a 
 contribution or expenditure in connection with any election to 
 any political office, or in connection with any primary election 
 or political convention or caucus held to select candidates for 
 any political office, or any corporation whatever, or any labor 
 organization, to make a contribution or expenditure in connec-
 tion with any election at which presidential and vice presiden-
 tial electors or a Senator or Representative in, or a Delegate or 
 Resident Commissioner to, Congress are to be voted for, or in 
 connection with any primary election or political convention or caucus held 
 to select candidates for any of the foregoing offices....
 
 (b)(2) For purposes of this section ... the term "contribution 
 or expenditure" shall include any direct or indirect payment, 
 distribution, loan, advance, deposit, or gift of money, or any 
 services, or anything of value ... to any candidate, campaign 
 committee, or political party or organization, in connection with 
 
federal offices, that same provision limits the contributions 
that nationally chartered banks and corporations may make 
"in connection ... with any political office." 2 U.S.C. s 441b 
(emphasis added). By distinguishing federal offices from 
"any political office," Congress plainly intended to reach 
certain contributions made to state and local offices. Guided 
by the same canon of consistent usage that the defendants 
invoke on behalf of the term contribution, we think it telling 
that Congress employed the phrase "any political office" 
when defining the scope of the foreign-national contribution 
provision. Accordingly, the language of s 441e does not un-
ambiguously cabin its reach to only federal offices.19

__________
 any election to any of the offices referred to in this sec-
 tion.... 
 
2 U.S.C. s 441b.

 19 Defendants attempt to answer the government's s 441b argu-
ment by noting that s 441b(b)(2) carries its own definition of the 
term contribution, distinct from that contained in s 431(8)(A)(i). It 
defines a contribution as "any direct or indirect payment, distribu-
tion, loan, advance, deposit or gift of money, or any services, or 
anything of value ... to any candidate, campaign committee, or 
political party or organization, in connection with any election to 
any of the offices referred to in this section." 2 U.S.C. s 441b 
(b)(2) (emphasis added). The question then becomes what are the 
offices referred to in this section. Subsection (a), for example, 
prohibits national banks and federally chartered corporations from 
making contributions "in connection with any election to any politi-
cal office, or in connection with any primary election or political 
convention or caucus held to select candidates for any political 
office." 2 U.S.C. s 441b(a).

 Defendants concede that the term "any political office" in 
s 441b(a) must include non-federal offices since elsewhere in the 
same subsection, the statute prohibits "any corporation whatever" 
(presumably, including, but not limited to federally chartered corpo-
rations) from making a contribution in connection with elections to 
federal offices. Presumably, if Congress had intended to prohibit 
only the entities referenced in subsection (a) (including national 
banks and federally chartered corporations) from making federal 

 The legislative history and structural scheme of the statute 
tend to buttress the FEC's broader interpretation of section 
441e but can hardly be read as making its case conclusively. 
Section 441e was preceded by 18 U.S.C. s 613, a subsection 
of the Foreign Agents Registration Act ("FARA"), which 
made it unlawful for "agents of foreign principals" to "know-
ingly mak[e] any contribution of money or other thing of 
value ... in connection with an election to any political office 
or in connection with any primary election, convention, or 
caucus held to select candidates for any political office." 18 
U.S.C. s 613 (repealed 1976). Nothing in the committee 
report that accompanied the original passage of section 613 
indicated that Congress intended for the phrase "an election 
to any political office or in connection with any primary 

__________
contributions, the clause concerning national banks and federally 
chartered corporations would have been surplusage.

 But then defendants go on to argue that if Congress had intended 
to modify the Act's generic definition of "contribution" for purposes 
of s 441e to cover non-federal elections, it could have done so 
explicitly as it did with s 441b. In response to this, the govern-
ment notes that ss 441b and 441e were both preceded by provisions 
in Title 18, which were moved to Title 2 as part of the amendments 
to FECA in 1976. The government argues that s 441b's special 
definition of the term contribution is a vestigial remainder from the 
preceding provision, 18 U.S.C. s 610, which Congress inadvertently 
failed to remove. It also points out that there was no definition of 
"contribution" in the predecessor to s 441e (which was part of the 
Foreign Agents Registration Act ("FARA")).

 Candidly we see no way to definitively resolve this statutory 
puzzle other than to declare an ambiguity and move on to our 
traditional rules for resolving ambiguities.

 As a final note, we do think both defendants and the district court 
make too much of the definition of "contribution" as controlling the 
interpretation of every section in which it appears. Congress itself 
performed with no such consistency. Although contribution by 
itself does mean contribution to a federal candidate, Congress in 
many sections of the Act added contributions "for Federal office" 
although that seems surplusage. In contrast in others like ss 441e 
and 441b, it used contribution in conjunction with the phrase "for 
any political office." Compare ss 441a, 441b, and 441e.

election, convention, or caucus held to select candidates for 
any political office" to be restricted to federal office.20 And 
significantly, this relevant language of s 441e has remained 
identical through multiple amendments to FARA and to the 
provision itself, when the 1976 amendments moved the provi-
sion from Title 18 to FECA. The 1976 FECA Amendments 
Report said "[section 441e] is the same as Section 613." H.R. 
Conf. Rep. No. 94-105, at 67 (1976) (emphasis added). Ulti-
mately, neither the plain language of s 441e nor its legislative 
history reveals Congress's unambiguous intent.

 In the face of such statutory ambiguity, we are required to 
reach Chevron's second prong, which requires judicial defer-
ence to an agency's reasonable interpretation. Indeed, this 
court has noted in several opinions that the FEC's express 
authorization to elucidate statutory policy in administering 
FECA "implies that Congress intended the FEC ... to 
resolve any ambiguities in statutory language. For these 
reasons, the FEC's interpretation of the Act should be ac-
corded considerable deference." Orloski v. FEC, 795 F.2d 
156, 164 (D.C. Cir. 1986); accord Fulani v. FEC, 147 F.3d 924 
(D.C. Cir. 1998); Republican Nat'l Comm. v. FEC, 76 F.3d 
400 (D.C. Cir. 1996); LaRouche v. FEC, 28 F.3d 137 (D.C. 
Cir. 1994).

 The FEC has consistently interpreted s 441e as applicable 
to federal, state, and local elections since 1976. In that year 
it promulgated 11 C.F.R. s 110.4 which provides, in relevant 

__________
 20 Indeed, the House Conference report accompanying the 
amendments to FARA, which established s 613, explain that the 
"new section relating to agents of foreign principals ... would 
prohibit such agents from making or promising to make in their 
capacity as agents contributions in connection with any election to 
any political office or in connection with any primary election, 
convention, or caucus to select new candidates." H.R. Rep. No. 
89-1470, at 15, reprinted in 1966 U.S.C.C.A.N. 2397, 2410-11. 
Notably the relevant language of the provision ("an election to any 
political office or in connection with any primary election, conven-
tion, or caucus held to select candidates for any political office") 
remains unchanged in the present provision.

part:21

 (1) A foreign national shall not directly or through any 
 other person make a contribution, or an expenditure, or 
 expressly or impliedly promise to make a contribution, or 
 an expenditure, in connection with a convention, a cau-
 cus, or a primary, general, special, or runoff election in 
 connection with any local, State, or Federal public office.
 
 (2) No person shall solicit, accept, or receive a contri-
 bution as set out above from a foreign national.
 
11 C.F.R. s 110.4(a).

 It is unfortunate, but true, that neither the FARA, in which 
the predecessor of s 441e first appeared, nor FECA, to which 
it was removed in 1976, provides detailed reasons why Con-
gress extended the ban in those sections to state and local 
elections. However, the legislative history of FARA does 
state repeatedly that it is designed to "protect the interests of 
the United States by requiring complete public disclosure by 
persons acting for or in the interests of foreign principals 
where their activities are political in nature." S. Rep. No. 
88-875, at 1 (1964).22 Hence, we do not regard the absence of 
any more explicit reasons by Congress (or the FEC) to be 
fatal to the reasonableness of the FEC's interpretation. The 

__________
 21 See Establishment Clause, 41 Fed. Reg. 35,950 (Aug. 25, 1976) 
(establishing 11 C.F.R. s 110.4(a) and other regulations following 
the 1976 amendments to FECA); see also 11 C.F.R. s 110.4(a); 
FEC Advisory Opinion, 1987-25 (Sept. 17. 1987), 1987 WL 61721.

 22 The Report continues: "Such public disclosure as required by 
the Act will permit the Government and the people of the United 
States to be informed as to the identities and interests of such 
persons and so be better able to appraise them and the purposes for 
which they work." S. Rep. No. 88-875, at 1; see also H.R. Rep. No. 
89-1470, at 2 (1966). Senator Fulbright also commented on the 
floor that foreign agents "will have to make public all their political 
contributions." 109 Cong. Rec. 16598 (1965) (emphasis added). 
Finally, in old s 613, "agent of a foreign principal" was defined as 
"one who within the United States solicits ... or disburses contri-
butions, loans, money or other things of value for or in the interests 
of such foreign principal" (emphasis added).

language of the statute and the explicit regulation of the FEC 
interpreting it provide an additional reason that the defen-
dants should have known that 104.8(e) imposed a true source 
reporting requirement for soft money donations.23

 III. Conclusion

 For the reasons previously stated in our decision in Hsia, 
we reverse the district court's orders that dismissed the false 
statement counts predicated on hard money contributions. 
We also find that the reporting regulation, section 104.8 (e), 
requires the reporting of the true sources of conduit contribu-
tions with respect to soft money and that s 441e forbids 
foreign national donations of soft money. Thus, the judgment 
of the district court, with respect to the soft money counts, is 
reversed as well.

 So ordered.

__________
 23 To argue, as defendants do, that the rule of lenity compels us to 
reject the FEC's otherwise reasonable interpretation of an ambigu-
ous statutory provision is to ignore established principles of law. 
See Babbitt, 515 U.S. at 704 n.18 ("We have never suggested that 
the rule of lenity should provide the standard for reviewing facial 
challenges to administrative regulations whenever the governing 
statute authorizes criminal enforcement. Even if there exist regu-
lations whose interpretations of statutory criminal material provide 
such inadequate notice of potential liability, the ... regulation [at 
issue], which has existed for two decades and gives fair warning of 
its consequences cannot be one of them.").